**No. 26-20219**

# In the United States Court of Appeals for the Fifth Circuit

DRAKE PLASTICS LIMITED COMPANY; DRAKE INSURANCE COMPANY; STRATEGIC RISK ALTERNATIVES, L.L.C., doing business as SRA 831(B) ADMIN,

*Plaintiffs-Appellants/Cross-Appellees,*

*v.*

INTERNAL REVENUE SERVICE; HONORABLE MICHAEL FAULKENDER, ACTING COMMISSIONER OF THE INTERNAL REVENUE SERVICE, in his official capacity; DEPARTMENT OF THE TREASURY; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF TREASURY,

*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

## BRIEF OF APPELLANTS

David B. Dove
**TROUTMAN PEPPER LOCKE LLP**
600 Peachtree Street, N.E.
Suite 3000
Atlanta, GA 30308
(404) 885-3680
david.dove@troutman.com

Chris Verducci
**TROUTMAN PEPPER LOCKE LLP**
Suite 2800
JP Morgan Chase Tower
Houston, TX 77002
(713) 226-1548
chris.verducci@troutman.com

Misha Tseytlin
*Counsel of Record*
**TROUTMAN PEPPER LOCKE LLP**
225 W Randolph Street
Suite 2600
Chicago, IL 60606
(312) 759-1920
misha.tseytlin@troutman.com

*Counsel to Plaintiffs-Appellants/Cross-Appellees Drake Plastics Limited Company, Drake Insurance Company, and Strategic Risk Alternatives, L.L.C., doing business as SRA 831(b) Admin*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### 1) Plaintiffs-Appellants/Cross-Appellees

Drake Plastics Limited Company; Drake Insurance Company; Strategic Risk Alternatives, L.L.C., doing business as SRA 831(b) Admin.

### 2) Defendants-Appellees/Cross-Appellants

Internal Revenue Service; Honorable Michael Faulkender, Acting Commissioner of the Internal Revenue Service, in his official capacity; Department of the Treasury; Scott Bessent, Secretary, U.S. Department of the Treasury.

### 3) Counsel for Plaintiffs-Appellants/Cross-Appellees

Misha Tseytlin, David B. Dove, and Chris Verducci.

### 4) Counsel for Defendants-Appellees/Cross-Appellants

Geoffrey Klimas, Adam S. Domitz, and Moira E. Goodwin.

**5) FRAP 26.1(a) Disclosure**

Drake Plastics Limited Company is a Texas limited liability company.   Drake Plastics Products Inc. owns 99% of Drake Plastics Limited Company.  The Steven M. Quance Living Trust owns 1%.  Drake Plastics Products Inc. is a closely held private corporation whose voting shares are held by the Steven M. Quance Living Trust (of which Steven M. Quance is grantor) and whose non-voting shares are held by Tyler Quance, Austin Quance, and Bryan Quance.  No publicly held corporation owns 10% or more of Drake Plastics Limited Company's equity.

Drake Insurance Company is an unincorporated protected cell of Southern Safe Insurance Ltd., domiciled in North Carolina.   Drake Plastics Limited Company is the owner of Drake Insurance Company. No publicly held corporation owns 10% or more of Drake Insurance Company.

Strategic Risk Alternatives, L.L.C., doing business as SRA 831(b) Admin, is an Idaho limited liability company owned equally by Van Carlson and Aaron Seehawer.  It has no parent corporation.  No publicly held corporation holds 10% or more of its membership interests.

## 6) Other Interested Persons

Counsel is unaware of any other person financially interested in the outcome of this litigation.

/s/ *Misha Tseytlin*
Misha Tseytlin
*Attorney of record for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents important questions regarding Defendants' compliance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and 26 U.S.C. § 6707A(c)(1) in issuing the far-reaching rule challenged here.  Plaintiffs respectfully submit that oral argument would assist this Court in addressing these issues and their significance for taxpayers and administrative law more broadly.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................ i

STATEMENT REGARDING ORAL ARGUMENT ................................. iv

TABLE OF CONTENTS ..................................................................... v

TABLE OF AUTHORITIES ............................................................ vii

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF ISSUES ................................................................ 2

INTRODUCTION .......................................................................... 3

STATEMENT OF THE CASE .......................................................... 6

    A.    Congress Provides Tax Benefits That Enable Small Businesses To Use Captive Insurance .................................... 6

    B.    IRS's Prior Attacks On Micro-Captive Insurance ............... 11

    C.    IRS Promulgates The Final Rule ....................................... 12

    D.    Procedural Background ..................................................... 18

SUMMARY OF THE ARGUMENT ................................................. 22

STANDARD OF REVIEW .............................................................. 25

ARGUMENT ............................................................................... 26

I.    IRS's Use Of Each Of The Building Blocks In The Rule's Transaction Of Interest Test Violates The APA .......................... 26

    A.    IRS's Reliance On The 60% Loss Ratio Factor Is Arbitrary And Capricious ................................................. 28

    B.    IRS's Reliance On The Financing Factor Is Arbitrary And Capricious ................................................................. 39

    C.    IRS's Reliance On The 20% Relationship Test Is Doubly Unlawful .............................................................. 45

        1.    IRS's Use Of The 20% Relationship Test Is Arbitrary And Capricious ........................................... 45

        2.    IRS's Use Of The 20% Relationship Test Is Also Contrary To Law ......................................................... 49

II.    The District Court's Misreading Of Section 6707A(c)(1) Cannot Save The Rule ................................................................. 55

    A.    The District Court Violated The *Chenery* Doctrine By Upholding The Rule Based Upon A Statutory Reading That The Agency Did Not Rely Upon, And Which Would Not Save The Rule In Any Event ............................. 55

    B.    IRS's Authority Under Section 6707A(c)(1) Is Not As Capacious As The District Court Claimed ........................... 58

CONCLUSION .................................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Int'l v. FCC,*
  885 F.3d 687 (D.C. Cir. 2018)..................................................36

*Ala. Power Co. v. Costle,*
  636 F.2d 323 (D.C. Cir. 1979)..................................................61

*All. for Fair Bd. Recruitment v. SEC,*
  125 F.4th 159 (5th Cir. 2024) (en banc)...........................46, 49

*Avrahami v. Comm'r,*
  149 T.C. 144 (2017) ..............................................................40

*CFM Ins., Inc. v. Comm'r,*
  T.C. Memo. 2025-83, 2025 WL 2207492 (Aug. 4, 2025) .......35

*Chamber of Com. of U.S. v. U.S. Dep't of Labor,*
  885 F.3d 360 (5th Cir. 2018) ..................................................27

*CIC Servs. LLC v. IRS,*
  592 F. Supp. 3d 677 (E.D. Tenn. 2022) ..................................12

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
  45 F.4th 846 (5th Cir. 2022)....................................25, 27, 65

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...............................................................26

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ...............................................................26

*Freedom From Religion Found. v. Abbott,*
  955 F.3d 417 (5th Cir. 2020) ..................................................25

*Friends of Animals v. Haaland,*
  997 F.3d 1010 (9th Cir. 2021) .....................................49, 50, 52

*Humana Inc. v. Comm'r,*
  881 F.2d 247 (6th Cir. 1989) ..................................................46

*In re NTE Conn., LLC,*
  26 F.4th 980 (D.C. Cir. 2022)..................................................43

*Jones v. Comm'r*,
  T.C. Memo. 2025-25, 2025 WL 1924077 (Mar. 25, 2025) ...................... 29

*King v. Time Warner Cable Inc.*,
  894 F.3d 473 (2d Cir. 2018) ................................................................. 61

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ............................................................... 25, 49, 57

*Louisiana v. U.S. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ........................................................ 26, 57

*Matter of GFS Indus., L.L.C.*,
  99 F.4th 223 (5th Cir. 2024) ................................................................ 60

*Miss. Poultry Ass'n v. Madigan*,
  992 F.2d 1359 (5th Cir. 1993) ............................................................. 49

*Moore v. Cain*,
  298 F.3d 361 (5th Cir. 2002) ............................................................... 59

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................... *passim*

*Nat'l Ass'n of Priv. Fund Mgrs. v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) ............................................................ 29

*Nat'l Mining Ass'n v. United Steel Workers*,
  985 F.3d 1309 (11th Cir. 2021) ........................................................... 43

*Oglala Sioux Tribe of Indians v. Andrus*,
  603 F.2d 707 (8th Cir. 1979) ............................................................... 49

*Patel v. Comm'r*,
  T.C. Memo. 2024-34, 2024 WL 1270772 (Mar. 26, 2024) ............... 29, 41

*R.V.I. Guar. Co. v. Comm'r*,
  145 T.C. 209 (2015) ............................................................... 8, 28, 32

*Rent-A-Ctr., Inc. v. Comm'r*,
  142 T.C. 1 (2014) ................................................................................ 35

*Safari Club Int'l v. Haaland*,
  31 F.4th 1157 (9th Cir. 2022) ........................................................ 42, 43

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .......................................................... 26, 27, 31, 57

*Summa Holdings, Inc. v. Comm'r,*
  848 F.3d 779 (6th Cir. 2017) ........................................................ 44, 52

*Suncor Energy (U.S.A.), Inc. v. EPA,*
  50 F.4th 1339 (10th Cir. 2022)...................................................... 27, 34

*Swift v. Comm'r,*
  T.C. Memo. 2024-13, 2024 WL 378671 (Feb. 1, 2024).......................... 40

*Syzygy Ins. Co. v. Comm'r,*
  T.C. Memo. 2019-34, 2019 WL 1559540 (Apr. 10, 2019)....................... 29

*United States v. Del. Dep't of Ins.,*
  66 F.4th 114 (3d Cir. 2023) ............................................................ 6, 50

*United States v. Lauderdale County,*
  914 F.3d 960 (5th Cir. 2019) ........................................................ 59, 63

*United States v. Palomares,*
  52 F.4th 640 (5th Cir. 2022)................................................................ 59

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ..................................................................... 59, 64

*Wages & White Lion Invs., LLC v. FDA,*
  16 F.4th 1130 (5th Cir. 2021)............................................................. 42

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ..................................................................... 59, 64

*Whirlwind Mfg. Co. v. United States,*
  344 F.2d 153 (5th Cir. 1965) .............................................................. 60

*Williamson v. Lee Optical of Okla., Inc.,*
  348 U.S. 483 (1955) ........................................................................... 54

**Statutes**

5 U.S.C. § 706........................................................... 26, 27, 49, 65

26 U.S.C. § 162.................................................................................9

26 U.S.C. § 831................................................................... *passim*

26 U.S.C. § 6011.............................................................................12

26 U.S.C. § 6103.............................................................................43

26 U.S.C. § 6707A .............................................................. *passim*

28 U.S.C. § 1291 .................................................................................. 1

28 U.S.C. § 1331 .................................................................................. 1

American Jobs Creation Act of 2004, Pub. L. 108-357, 118 Stat. 1418 (2004) ................................................................................................ 9

Pension Funding Equity Act of 2004, Pub. L. 108-218, 118 Stat. 596 (2004) ................................................................................................ 9

Protecting Americans from Tax Hikes Act, Pub. L. 114-113, 129 Stat. 2242 (2015) .................................................................................... 10

Tax Reform Act of 1986, Pub. L. No.99-514, 100 Stat. 2085 (1986) .......... 9

Tex. Ins. Code § 964.056 ................................................................... 8

## Regulations

26 C.F.R. § 1.6011-4 ........................................................................ 13

26 C.F.R. § 1.6011-10 ................................................. 15, 16, 17, 20

26 C.F.R. § 1.6011-11 .................................................................. *passim*

26 C.F.R. § 301.6111-3 ................................................................... 19

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21547 (proposed Apr. 11, 2023) .................... 12, 14

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3534 (Jan. 14, 2025).................................. *passim*

## Other Authorities

Matthew Queen & Light Townsend, Modern Captive Insurance: A Legal Guide to Formation, Operation, and Exit Strategies (2019) ..... 7

*Potential*, Oxford English Dictionary .................................................. 60

Rev. Rul. 2001-31, 2001-1 C.B. 1348 ................................................... 11

Rev. Rul. 77-316, 1977-2 C.B. 53 ........................................................ 11

S. Rep. No.114-16 (2015)....................................................... 10, 50, 54

*Type*, Oxford English Dictionary ........................................................ 59

x

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction under 28 U.S.C. § 1331.  On April 15, 2026, the Court entered final judgment disposing of all claims.   RE.18 (ROA.24932). [1]   Out of an abundance of caution, Plaintiffs also moved for entry of partial final judgment under Federal Rule of Civil Procedure 54(b), ROA.24949, which the District Court granted on May 15, 2026, RE.73 (ROA.24975).  This Court has jurisdiction under 28 U.S.C. § 1291.  Plaintiffs timely filed their notice of appeal on April 30, 2026.  RE.10 (ROA.10); RE.12-14 (ROA.24935-24937).

---

[1] Throughout this brief, the Record Excerpts are cited as "RE.__" and the Record on Appeal is cited as "ROA.__."

## STATEMENT OF ISSUES

The District Court upheld the Final Rule's designation of micro-captive transactions as "transactions of interest" through 26 C.F.R. § 1.6011-11. This appeal presents the following issues:

1. Whether IRS's reliance on the 60% Loss Ratio Factor was arbitrary and capricious because this Factor lacks a sufficient basis in the administrative record.

2. Whether IRS's reliance on the Financing Factor was arbitrary and capricious because this Factor lacks a sufficient basis in the administrative record.

3. Whether IRS's reliance on the 20% Relationship Test was arbitrary and capricious because this Test lacks a sufficient basis in the administrative record.

4. Whether IRS's use of the 20% Relationship Test is contrary to law because it frustrates Congress' policy judgment in the PATH Act.

5. Whether the District Court erred by upholding the Rule's Transaction of Interest provision under its *sua sponte* reading of 26 U.S.C. § 6707A(c)(1).

## INTRODUCTION

Captive insurance allows businesses to protect against risks that commercial insurers cannot or will not adequately cover by creating an insurance company that the business owns and controls.  Because captive insurance fills a genuine gap in the commercial insurance market, it is no surprise that businesses of all sizes—including all of the Nation's largest companies—rely on it.  But captive insurance is expensive to form in part because of state-law requirements designed to safeguard solvency, making this vital option unavailable to many small businesses. Congress recognized and stepped in to solve this problem by providing qualifying small insurers with a federal income tax benefit through 26 U.S.C. § 831(b).  When a small captive—commonly known as a "micro-captive"—meets Congress' statutory criteria and elects to be taxed under Section 831(b), it pays income tax only on its investment income, meaning that the premiums it receives are not taxed.

The Internal Revenue Service ("IRS")[2] strongly disagrees with Congress' decision to incentivize micro-captives and has spent decades

---

[2] For simplicity, this brief refers to IRS and the Department of the Treasury—including the Secretary of the Treasury, who promulgated the Final Rule through delegated authority—collectively as "IRS."

trying to destroy this form of insurance. After several failed gambits to undermine micro-captives, IRS settled on its current strategy: adopting a rule that forces most micro-captives into a *de facto* tax audit regime. *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3534 (Jan. 14, 2025) (the "Final Rule" or "Rule"). To achieve this, IRS invoked Section 6707A of the Internal Revenue Code, which allows the agency to order taxpayer reporting of potentially abusive Transactions of Interest or presumptively abusive Listed Transactions. IRS then constructed the criteria for mandatory reporting based upon several building blocks that are so common and expected for micro-captives that they cover much of the micro-captive industry.

While the District Court below correctly invalidated the Final Rule's Listed Transaction portion, it upheld the Transaction of Interest portion. This Court should finish the job and require vacatur of the Rule in its entirety.

The Rule's Transaction of Interest portion is unlawful for several reasons, with the most obvious being that each of its three building blocks lacks support in the administrative record. By IRS's own telling, the building blocks of the Rule's Transaction of Interest test seek to identify

4

transactions that are "consistently associated with transactions that are or may be tax avoidance transactions," 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55, but they clearly fail at that task. Take, for example, the Rule's test providing that a micro-captive transaction is "consistently" associated with tax avoidance if it has a loss ratio below 60%. The administrative record shows beyond reasonable dispute that loss ratios well below 60% are in the heartland of the range one would expect for legitimate micro-captives. Indeed, the Rule does not identify any captive insurer with even a 5% loss ratio that failed to provide legitimate insurance, let alone one with a loss ratio near 60%. The record basis for the Rule's other building blocks is no better, with IRS so lacking in record support that it ended up relying upon its unspecified "experience" to justify these criteria, a form of black box reasoning that the APA forbids.

The District Court did not hold that the administrative record supported IRS's claim that the Rule's Transaction of Interest building blocks are "consistently" associated with tax avoidance, because such a conclusion would have been impossible. It instead upheld the Rule on a different basis. Engaging in a *sua sponte* reading of Section 6707A—the provision that IRS invoked to justify the Rule—the District Court held

5

that this statute permits IRS to gather information from companies without any showing that the Rule's criteria actually identify transactions that "consistently," 90 Fed. Reg. at 3546, give rise to tax avoidance. The District Court's approach violates the *Chenery* doctrine, which prohibits courts from upholding a rule on a basis that the agency did not rely upon in the record below. And, in any event, the District Court misread Section 6707A, as that provision does not give the agency a blank check to collect any information, from any taxpayer, for any reason, subject only to APA arbitrary-and-capricious review.

Accordingly, this Court should order the District Court to vacate the Final Rule's Transaction of Interest portion.

## STATEMENT OF THE CASE

### A. Congress Provides Tax Benefits That Enable Small Businesses To Use Captive Insurance

1. Captive insurance involves an insurance company that is owned and controlled by the entities that it insures. *United States v. Del. Dep't of Ins.*, 66 F.4th 114, 116 n.1 (3d Cir. 2023). A business forms an insurance company (*i.e.*, the captive), capitalizes it, and then pays premiums to it for coverage of the business's own risks. ROA.5272.

6

Captive insurance is the "zenith of risk financing," offering "flexibility regarding coverage, claims, premium, and control." Matthew Queen & Light Townsend, Modern Captive Insurance: A Legal Guide to Formation, Operation, and Exit Strategies xxi (2019). It allows firms to customize needed insurance coverage for their business risks and obtain protection against low-frequency, high-severity events that are "extremely difficult or even impossible to place in traditional markets." ROA.5781; *see* ROA.14733; ROA.5218; ROA.5383; ROA.5205. During the COVID-19 pandemic, for instance, captives paid claims that commercial carriers denied, enabling many small businesses to survive. ROA.4965. "All Fortune 500 companies" and thousands of other businesses use captive insurance. ROA.22598; *see* ROA.5383.

Two features of how captives operate are particularly important here. First, captives often insure low-frequency, high-severity risks, and so maintain loss ratios (the ratio of claims paid to premiums earned) below those of commercial carriers. ROA.4997-4998; *see* ROA.5197; ROA.5205. A captive that covers earthquake or terrorism risk may collect premiums for many years without a covered event occurring, and its loss ratio in those years reflects the absence of a catastrophe, not the

7

absence of real risk. *See R.V.I. Guar. Co. v. Comm'r*, 145 T.C. 209, 227 (2015); ROA.5199-5200. Second, captives commonly lend money to the businesses that own them, investing the premiums they hold so that they can pay claims later, just as commercial insurance companies do. ROA.5224; ROA.14712.

2. Although captive insurance can be "very useful to many relatively small firms," the "initial formation and operational costs" are often prohibitive. *See* ROA.22598. Before a captive may write a single insurance policy, state law generally requires it to set aside a minimum amount of its own money that it cannot spend or pledge, so that funds will be on hand to pay claims. *See, e.g.*, Tex. Ins. Code § 964.056(b). Captives must also often file reports with state regulators and obtain approval before making loans or paying dividends—obligations that are expensive and can put captive insurance out of reach for small businesses. *See* ROA.5370-5371; ROA.5359; ROA.5322.[3]

---

[3] This regulatory architecture is state-based; insurance has been "chartered and regulated solely by the states for the past 150 years." ROA.6096. Congress preserved this framework through the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*

Recognizing the barriers to captive formation, Congress enacted Section 831(b). Tax Reform Act of 1986, Pub. L. No.99-514, § 1024(a), 100 Stat. 2085, 2405 (1986). As originally enacted, Section 831(b) permitted qualifying small insurance companies to pay federal income tax solely on investment income—excluding premium income from taxation—provided that the company's total premiums remained below $1.2 million. *Id.* When combined with an insured business's Section 162(a) deduction for its insurance premium expenses, 26 U.S.C. § 162(a), small firms can use the tax savings to offset initial formation and operational costs, *see* ROA.22598. In 2004, Congress expanded Section 831(b)'s availability around the same time that it enacted Section 6707A—the provision that the Rule now invokes. *See* Pension Funding Equity Act of 2004, Pub. L. 108-218, § 206(d), 118 Stat. 596, 611 (2004) (expanding Section 831(b)); American Jobs Creation Act of 2004, Pub. L. 108-357, tit. VIII, § 811(a), 118 Stat. 1418, 1575 (2004) (enacting Section 6707A). The Joint Committee on Taxation explanation accompanying that legislation stated that "Congress does not believe that [Section 831(b)] is abused to avoid tax on investment income." ROA.6189.

Congress expanded Section 831(b) again in 2015 through the Protecting Americans from Tax Hikes ("PATH") Act, broadening access to captive insurance for additional small businesses. Pub. L. 114-113, 129 Stat. 2242 (2015). Under the PATH Act, a non-life "insurance company" is eligible for Section 831(b)'s benefits if it receives $2.2 million or less in annual net written premiums, adjusted for inflation, during the taxable year. 26 U.S.C. § 831(b)(2)(A)(i), (b)(2)(E). The PATH Act also imposed "diversification requirements" to guard against perceived abuses, and gave captives two ways to satisfy them. Under the *risk diversification test*, "no more than 20 percent" of a captive's annual "net written premiums (or, if greater, direct written premiums)" may be "attributable to any one policyholder." *Id.* § 831(b)(2)(B)(i)(I). Under the *relatedness test*, a captive qualifies if its owners and their family members hold roughly the same or greater interest in the insured entity as they hold in the captive. *Id.* § 831(b)(2)(B)(i)(II). Congress designed these requirements to address "abuse of captive insurance companies for estate planning purposes," *see* S. Rep. No.114-16, at 3 (2015), while preserving broad access to Section 831(b)—including for closely held captives satisfying the relatedness test, *see* ROA.6149-6150 (rejecting

10

"proposal that would narrow eligibility to elect the alternative tax in a manner intended to address abuse potential, but that may cause problems for certain States").

## B.   IRS's Prior Attacks On Micro-Captive Insurance

IRS has made no secret of its distaste for small captive insurance companies.  In 1977, IRS adopted a blanket rule barring businesses from deducting captive insurance premium expenses.  *See* Rev. Rul. 77-316, 1977-2 C.B. 53.  The agency abandoned that position in 2001 after "[n]o court" would "fully accept[ ]" it.  Rev. Rul. 2001-31, 2001-1 C.B. 1348; ROA.4544-4546.  Then, beginning in 2015, IRS began placing micro-captives on its yearly "dirty dozen" list of alleged tax scams.  ROA.5274; ROA.5392-5393.

In 2016, IRS issued Notice 2016-66, unlawfully attempting to designate most micro-captives as "transactions of interest," ROA.4382—a type of "reportable transaction" that IRS "determines as having a potential for tax avoidance or evasion" under 26 C.F.R. § 1.6011-4 and 26 U.S.C. § 6011, *see* 26 U.S.C. § 6707A(c)(1).  Notice 2016-66 classified a micro-captive as a transaction of interest if its owner held at least 20% of the captive's voting power or value, and either (i) provided or agreed to

11

provide tax-free financing to its insureds or related parties, or (ii) maintained a "loss ratio" below 70% over the most recent five taxable years. ROA.4385-4386. As IRS's counsel stated: "[M]y guess is that the real motivation here may be to chill, rather than to derive info." ROA.13089; *see* ROA.13088. A federal court in *CIC Services LLC v. IRS*, 592 F. Supp. 3d 677 (E.D. Tenn. 2022), invalidated Notice 2016-66 both for IRS's lack of record support and for its failure to comply with the APA's notice-and-comment mandate.

### C.   IRS Promulgates The Final Rule

1. In April 2023, IRS proposed an even more sweeping attack on the micro-captive industry, now purporting to identify both "transactions of interest" and "listed transactions," creating a *de facto* audit regime for much of the micro-captive industry. *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21547 (proposed Apr. 11, 2023). IRS relied upon Sections 6011 and 6707A, which create a disclosure and enforcement regime allowing IRS to designate categories of transactions that taxpayers must report to IRS while imposing monetary penalties on those who fail to report. 26 U.S.C. §§ 6011, 6707A. A taxpayer who participates in a designated transaction must file Form

8886 each year identifying the transaction and the professionals who assisted with it, and must send a copy to IRS's Office of Tax Shelter Analysis. *See* 26 C.F.R. § 1.6011-4(a), (d)–(e).

Under Section 6707A, a "transaction of interest" is a "reportable transaction" that is "of a type which the Secretary determines as having a potential for tax avoidance or evasion." 26 U.S.C. § 6707A(c)(1); *see* 26 C.F.R. § 1.6011-4(b)(6). A "listed transaction," in turn, is a "reportable transaction" that "is the same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction." 26 U.S.C. § 6707A(c)(2); *see* 26 C.F.R. § 1.6011-4(b)(2). In other words, a transaction of interest is potentially tax abusive, whereas a listed transaction is presumptively tax abusive. The failure to disclose a transaction of interest can result in penalties of up to $50,000, whereas nondisclosure of a listed transaction can result in penalties of up to $200,000. 26 U.S.C. § 6707A(b)(2)(A)–(B). IRS may rescind penalties for a failure to disclose a transaction of interest, but not for a failure to disclose a listed transaction. *Id.* § 6707A(d)(1)(A).

The proposal's building blocks were similar to those in the Final Rule. It applied the same 20% Relationship Test—reaching any captive

in which the insured entity, its owners, or persons related to them held at least 20% of the captive. 88 Fed. Reg. at 21551. The proposal would have designated a captive a presumptively abusive "listed transaction" if it satisfied the 20% Relationship Test and either the Loss Ratio Factor (a loss ratio below 65%) or the Financing Factor (related-party financing), *id.* at 21561–62, and a potentially abusive "transaction of interest" under similar terms, *id.* at 21563. This proposal drew negative comments, including from members of the House Ways and Means Committee, who cautioned that the proposal "would effectively eliminate the section 831(b) election for all or most small captive insurance companies" and would result in "targeting the entire industry via a nationwide dragnet program." ROA.14750-14751.

2. On January 14, 2025, IRS promulgated the Final Rule. *See* 90 Fed. Reg. at 3534. The Rule imposes disclosure requirements on micro-captives and subjects them to substantial penalties for non-compliance, based upon several building blocks. Under 26 C.F.R. § 1.6011-11, a captive is a potentially tax abusive "transaction of interest" if it satisfies (1) the 20% Relationship Test *and* (2) *either* the 60% Loss Ratio Factor *or* the Financing Factor. 90 Fed. Reg. at 3562–63. Under 26 C.F.R.

14

§ 1.6011-10, a captive is a presumptively tax abusive "listed transaction" if it satisfies (1) the 20% Relationship Test, (2) the 30% Loss Ratio Factor, *and* (3) the Financing Factor. *Id.* at 3559–60. According to IRS, these building blocks identify transactions that are "consistently associated with transactions that are or may be tax avoidance transactions." *Id.* at 3546; *id.* at 3538–39, 3554–55 (the factors "strongly indicate tax avoidance or the potential for tax avoidance" and "consistently give[ ] rise to tax avoidance").[4] The building blocks that make up the Rule, along with the record support the agency identified to support each, are:

*The 30% and 60% Loss Ratio Factors*. A transaction satisfies this building block for Listed Transactions if its aggregate loss ratio over the last 10 taxable years fell below 30% (the "30% Loss Ratio Factor"). *See id.* at 3560; 26 C.F.R. § 1.6011-10(c)(2). It meets this building block for Transactions of Interest if its aggregate loss ratio over the last 10 taxable years (or all taxable years, if the captive has existed for fewer than 10) fell below 60% (the "60% Loss Ratio Factor"). 90 Fed. Reg. at 3562; 26 C.F.R. § 1.6011-11(c)(2). A "loss ratio," as the Rule uses that term, refers

---

[4] The District Court correctly recognized that the Listed Transaction designation under Section 6707A(c)(2) demands a higher showing and invalidated that portion of the Rule. *See infra* pp.21–22.

15

to the liabilities that a micro-captive incurs with respect to insured losses and claim administration, compared against the premiums collected after paying policyholder dividends.    26 C.F.R. § 1.6011-10(c)(2); 26 C.F.R. § 1.6011-11(c)(2).

As claimed support for the 30% and 60% Loss Ratio Factors, the Final Rule relies on three sources.  First, the Rule cites a handful of Tax Court decisions.  90 Fed. Reg. at 3541.  But to the extent these decisions addressed loss ratios at all, the ratios discussed were well under 5%, and in most instances near zero—nowhere near either the 30% or 60% threshold that the Rule adopted.  *Infra* pp.28–30.  Second, the Rule relies generally upon "[c]urrent examinations and litigation," 90 Fed. Reg. at 3538, but does not disclose what those examinations revealed that could support the Rule.  *Infra* pp.30–32.  Third, IRS cites loss-ratio data from the National Association of Insurance Commissioners ("NAIC"), 90 Fed. Reg. at 3542—industry-wide averages drawn from traditional property-and-casualty insurers, none of which are micro-captives and which have entirely different risk profiles and cost structures.  *Infra* pp.33–38.  The NAIC reported *average* annual loss ratios for non-life insurers ranging between 67.2% and 76.2% from 2012 to 2021.  90 Fed. Reg. at 3542.  The

Rule then adjusted the proposed 65% threshold downward to 60% for Transactions of Interest after removing certain high-frequency, low-severity coverage lines from the dataset. *Id.*

*The Financing Factor*. A transaction satisfies this building block if any portion of the captive's premium income is "made available as financing or otherwise conveyed" to a related party in a transaction that did not result in taxable income or gain. 90 Fed. Reg. at 3560; 26 C.F.R. § 1.6011-10(c)(1)(i); *id.* § 1.6011-11(c)(1)(i). The Final Rule relies upon Tax Court decisions in which the captive had engaged in related-party financing, 90 Fed. Reg. at 3546, none of which held that related-party financing itself suggests abuse in any respect, *see infra* pp.40–44. The Rule also invokes IRS's unspecified "experience," 90 Fed. Reg. at 3546, without disclosing what that experience revealed.

*The 20% Relationship Test*. A transaction satisfies this building block if 20% or more of the captive's total assets or the total voting power or value of its outstanding stock or equity interests is owned by an insured, an owner, or persons related to an insured or owner. *Id.* at 3559; 26 C.F.R. § 1.6011-10(b)(1)(iii); *id.* § 1.6011-11(b)(1). The Rule offers no data, study, or empirical analysis connecting the 20% ownership

17

threshold to the identification of transactions that are "consistently associated with transactions that are or may be tax avoidance transactions." *See id.* at 3546; *id.* at 3539, 3554–55.

3. The Rule sweeps in much of the micro-captive industry. Loss ratios below 60% and 30% are ordinary for captives, which "by structure and design" run "much lower loss ratios" than commercial carriers because of the low-frequency, high-severity risks they insure. ROA.5570; *see* ROA.4997-4998; ROA.5197; ROA.5205. Related-party lending is also common because for many single-parent captives, "invested assets are composed almost entirely of loan-back arrangements with the parent." ROA.14712. And related-party ownership at or above 20% is typical, as "the vast majority of captive insurance companies are owned by the policyholder," ROA.5608, and small captives historically "have been owned only by a single insured entity," ROA.5571.

### D.    Procedural Background

1. Plaintiff Drake Plastics Ltd. Co. is a Houston manufacturer of high-performance plastic components. ROA.19.    Plaintiff Drake Insurance Co. is its captive insurer, covering workplace injuries, product liability, and other business risks. ROA.19.    Plaintiff Strategic Risk

Alternatives, L.L.C., doing business as SRA 831(b) Admin, forms and administers micro-captive insurance programs. ROA.21-22. It is a "material advisor" under the reportable-transaction rules, ROA.22—it provides material aid or advice in setting up or carrying out a reportable transaction and derives more than a threshold amount of income for that work, *see* 26 C.F.R. § 301.6111-3(b).

The Rule imposes significant burdens on Plaintiffs. A micro-captive swept in by the Rule must file a Form 8886 for every year in which it takes part in a designated transaction, and the obligation reaches back to every tax year for which the limitations period remains open. 26 C.F.R. § 1.6011-11(h)(2). Material advisors such as SRA bear parallel obligations reaching back six years. 26 C.F.R. § 1.6011-11(h)(3). Beyond the paperwork, the Rule brands Plaintiffs' arrangements as potentially or presumptively tax abusive, placing them into a *de facto* audit regime. Drake Plastics and Drake Insurance cannot claim Section 831(b)'s benefits without being subjected to this regime, and so they have forgone benefits that Congress made available to them. ROA.19-21. And SRA has lost clients who revoked their elections or wound down their captives

19

rather than be labeled potential or presumptive tax abusers under this *de facto* audit regime. ROA.21-24; ROA.353-357.

2. On June 4, 2025, Plaintiffs filed this lawsuit challenging both the Final Rule's listed-transaction designation (26 C.F.R. § 1.6011-10) and its transaction-of-interest designation (26 C.F.R. § 1.6011-11). Eventually, the parties cross-moved for summary judgment.[5] Plaintiffs focused on the absence of record support for the Rule's building blocks—the 30% and 60% Loss Ratio Factors, the Financing Factor, and the 20% Relationship Test. ROA.24747-24759. They also argued that the Final Rule exceeds IRS's authority under Section 6707A because its non-statutory criteria treat ordinary features of congressionally encouraged captives as markers of tax avoidance, frustrating Congress' policy judgment in Section 831(b). ROA.24741-24746. IRS, in turn, argued that the record justified the Final Rule's building blocks as "consistently found in arrangements that do not provide insurance for federal income tax purposes," ROA.24796, and "consistently giv[ing] rise to tax avoidance," ROA.24795-24796 (quoting 90 Fed. Reg. at 3555).

---

[5] Plaintiffs initially moved for a preliminary injunction, ROA.316-317, but the District Court never decided that motion.

20

3. On April 15, 2026, the District Court issued a split decision.  It began with a *sua sponte* interpretation of what the Court viewed as the outer boundaries of IRS's authority under Section 6707A(c).  For "transactions of interest" under Section 6707A(c)(1), the Court held that IRS need show only that a transaction is "of a type" that "may" not be "really for insurance," RE.40 (ROA.24899); *see* RE.37-38 (ROA.24896-24897), a standard the Court described as a "low bar," RE.37 (ROA.24896).  For "listed transactions" under Section 6707A(c)(2), the Court held that IRS must show the transactions are "presumptively" tax-avoidant—that is, more often than not abusive.  RE.38-40 (ROA.24897-24899).  The Court then applied the lower standard to the Rule—including citing numerous possible rationales under that standard found nowhere in the administrative record or IRS's reasoning—to uphold the Transaction of Interest regulation.  RE.45-50 (ROA.24904-24909); RE.53-67 (ROA.24912-24926).  However, the Court invalidated the Listed Transaction regulation under the higher statutory standard, RE.50-53

21

(ROA.24909-24912), and severed that portion of the Rule, RE.68-72 (ROA.24927-24931).[6]

## SUMMARY OF THE ARGUMENT

I. IRS's reliance on the Rule's three building blocks for its Transaction of Interest test was arbitrary and capricious.

A. The administrative record does not support IRS's reliance on the 60% Loss Ratio Factor. The Tax Court decisions that the Rule invokes involve loss ratios near zero, and one of the Rule's primary Tax Court authorities held that ratios roughly half the Rule's threshold evidenced genuine insurance. IRS's own retained expert called a ratio above 10% "reasonable." The agency's remaining support is a dataset whose publisher disclaims the use to which IRS put it, and which excludes the vast majority of captives. The record shows that loss ratios well below 60% are consistent with genuine insurance, and does not support IRS's

---

[6] Parallel challenges to the Rule are pending. The Eastern District of Tennessee granted summary judgment for IRS, and that decision is on appeal. *CIC Servs., LLC v. IRS*, No.3:25-cv-146, 2026 WL 622836, at \*9 (E.D. Tenn. Mar. 5, 2026), *appeal pending*, No.26-5210 (6th Cir.). The Northern District of Texas granted summary judgment in the Government's favor, upholding the Rule's Transaction of Interest portion without addressing the Rule's Listed Transaction portion in light of the present case. *Ryan LLC v. IRS*, No.3:25-cv-00078-B, 2026 WL 1847197, at \*16 (N.D. Tex. June 26, 2026), *appeal pending*, No.26-10708 (5th Cir.).

claim that such ratios are "consistently associated with transactions that are or may be tax avoidance transactions," 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55.

B. The Financing Factor fares no better. The Tax Court decisions that the Rule cites for this Factor turned on liquidity—whether the captive's assets could actually be reached to pay claims—and the Factor asks nothing about liquidity. The agency's only other support is its unspecified, undisclosed "experience," which cannot support the Rule under APA review, and a policy-based objection to the very statutory incentive that Congress created.

C. The 20% Relationship Test is doubly unlawful. First, the Rule identifies no record basis for concluding that *any* degree of common ownership is consistently associated with tax avoidance, let alone 20%. Second, this Test is also contrary to law. The PATH Act gave captives two independent diversification pathways: the first caps premium concentration at 20% per policyholder, and the second turns on relative ownership, requiring only that a captive's owners hold no greater interest in the captive than in the insured business. The Rule caps related-party ownership at 20%. That effectively eliminates Congress' second

23

pathway, because a captive whose owners hold 100% of both entities satisfies the PATH Act's second path but cannot escape the Rule's Test.

II. The District Court's contrary reading of Section 6707A(c)(1) cannot save the Rule's Transaction of Interest portion.

A. The District Court upheld the Rule on a ground that the agency never invoked. The Rule declares that its regulations identify fact patterns "consistently associated with transactions that are or may be tax avoidance transactions," 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55, and IRS defended the Rule on that basis. Plaintiffs contended that the record does not support that determination. The District Court never resolved that question. Instead, the Court adopted a *sua* sponte reading of what it viewed as the outer boundaries of IRS's authority under Section 6707A(c)(1), and then upheld the Rule based upon that reading. But that is not the basis that the agency cited in the Rule, and a court may not uphold a rule on a ground that the agency did not rely upon. And regardless, the record so clearly refutes the Rule's building blocks that the Rule could not survive even the District Court's overbroad reading of Section 6707A(c)(1).

24

B.  In any event, Section 6707A(c)(1)'s outer boundary is narrower than the District Court claimed.  The provision reaches transactions "of a type which the Secretary determines as having a potential for tax avoidance or evasion."  26 U.S.C. § 6707A(c)(1).  A "type" is a group marked out by distinguishing characteristics that its members share and others lack, and a "potential" is a capacity that arises from those same characteristics.  Read together, those terms authorize IRS to require disclosure of transactions "consistently associated with transactions that are or may be tax avoidance transactions"—the standard that the Rule announced for itself.  90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55.

### STANDARD OF REVIEW

This Court reviews the grant of summary judgment *de novo.* *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020).  Whether the Rule violates the APA is a question of law reviewed *de novo.  See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022).  Statutory interpretation is a *de novo* question.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).  Under the *Chenery* doctrine, a court may uphold agency action only on the grounds that the agency invoked, and it may not supply a rationale that the

agency did not rely upon.  *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024).

## ARGUMENT

### I.    IRS's Use Of Each Of The Building Blocks In The Rule's Transaction Of Interest Test Violates The APA

The APA requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C). Agency action is arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  The agency may not "offer[ ] an explanation for its decision that runs counter to the evidence before [it]," nor may it rely on irrelevant data.  *State Farm*, 463 U.S. at 43.  Agency action is also unlawful where its factors bear "no apparent relation" to the statutory standard.  *Suncor Energy (U.S.A.), Inc. v. EPA*, 50 F.4th

1339, 1357–58 (10th Cir. 2022). And while arbitrary and capricious review is deferential, it "has serious bite" and does not relieve the agency of supplying the explanation and record support that the APA requires. *Data Mktg.*, 45 F.4th at 856.

Here, IRS's reliance on each of the building blocks that it used to construct its Transaction of Interest test was arbitrary and capricious, and its use of the 20% Relationship Test is also contrary to law. *See* 5 U.S.C. § 706(2)(A), (C). There is no record evidence that these building blocks accomplish the purpose for which IRS invoked them: identifying transactions that are "consistently associated with transactions that are or may be tax avoidance transactions." 90 Fed. Reg. at 3546; *id.* at 3554–55. Instead, the record shows that each only identifies an ordinary, expected feature of legitimate captive insurance. Further, these blocks are interlocking elements, and the Rule does not provide that any one of them could sustain the Rule's Transaction of Interest designation without the others. Thus, if any of the building blocks lacks sufficient record support, the regulation must be vacated in its entirety. *See Chenery*, 318 U.S. at 87; *Chamber of Com. of U.S. v. U.S. Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018).

### A.    IRS's Reliance On The 60% Loss Ratio Factor Is Arbitrary And Capricious

The 60% Loss Ratio Factor is one of the building blocks of the Rule's Transaction of Interest portion.  *See* 90 Fed. Reg. at 3540.  According to the Rule, IRS relied upon this building block because a loss ratio below 60% signals "excessive pricing of premiums and artificially low or nonexistent claims activity."  *Id.*  But nothing in the administrative record supports the agency's conclusion that a 60% threshold "strongly indicate[s] tax avoidance or the potential for tax avoidance."  *See id.* at 3554.  To the contrary, the record shows that loss ratios below 60% are a common and expected feature of legitimate micro-captives.  *See* ROA.4997-4998; ROA.5197.

*The Tax Court Cases*. The Tax Court cases that the Final Rule relies upon only refute the 60% Loss Ratio Factor.  In *R.V.I. Guaranty*, one of IRS's lead authorities in the Rule, the Tax Court held that an insurer's loss ratios—which averaged 28% over one ten-year period and 32% across the periods that the court examined—reflected "significant claims" and a "significant risk of loss," and were "more than sufficient to treat" the arrangements "as 'insurance contracts' for Federal income tax purposes." 145 T.C. at 227–28.  ***In other words, the Tax Court held that loss***

28

***ratios roughly half of the Rule's 60% threshold are evidence of genuine insurance****. Id.* The only Tax Court cases finding that a low ratio suggested anything negative about an insurer involved ratios nowhere near 60%. *See, e.g.*, *Jones v. Comm'r*, T.C. Memo. 2025-25, 2025 WL 1924077, at \*24 (Mar. 25, 2025) (loss ratios of 0.2% and 0.69%); *Patel v. Comm'r*, T.C. Memo. 2024-34, 2024 WL 1270772, at \*19 (Mar. 26, 2024) (loss ratios under 5%); *Syzygy Ins. Co. v. Comm'r*, T.C. Memo. 2019-34, 2019 WL 1559540, at \*6 (Apr. 10, 2019) (loss ratio of 1.5%). The gap between the ratios in cases of abuse (near zero) and the Rule's threshold (60%) shows that there is no "rational connection," *State Farm*, 463 U.S. at 43, between the 60% Loss Ratio Factor and identifying transactions that are "consistently associated with transactions that are or may be tax avoidance transactions," 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55; *see Nat'l Ass'n of Priv. Fund Mgrs. v. SEC*, 103 F.4th 1097, 1113 & n.11 (5th Cir. 2024) (vacating rule where agency "largely fail[ed] to 'define' the fraudulent acts or practices that the Final Rule purportedly is designed to prevent" and had "observed misconduct by about 0.05% of advisers").

The District Court faulted Plaintiffs for citing these cases, reasoning that the Tax Court decisions reflect a "selection bias" because

taxpayers litigate only when the assessed deficiencies are largest. RE.66-67 (ROA.24925-24926). But the Rule itself invokes these decisions as record support. *See* 90 Fed. Reg. at 3541. The District Court's effort to distinguish *R.V.I.* as involving "catastrophic-type coverage," RE.66 (ROA.24925), similarly fails because micro-captives exist precisely to insure such risks, *see* ROA.4997-4998; ROA.5197; ROA.5205. And, of course, IRS relied upon *R.V.I.* in the Rule. 90 Fed. Reg. at 3541.[7]

*IRS's Expert Reports*. The Final Rule invokes unspecified "[c]urrent examinations and litigation." *Id.* at 3538. The only such materials in the record are briefing and expert reports prepared for micro-captive litigation, and none of these identifies a 60% or lower loss ratio (as opposed to extremely low, near-zero loss ratios) as an indicator of "excessive pricing of premiums and artificially low or nonexistent claims activity." *Id.* at 3540. Indeed, IRS's own expert stated that a loss ratio greater than "10%"—one-sixth of 60%—is "reasonable." ROA.17533.

---

[7] The District Court's suggestion that the ten-year computation period adequately accounts for low-frequency, high-severity risks fares no better. *See* RE.61. Treasury's own terrorism reinsurance program carried a 0% loss ratio for 16 consecutive years. *See* ROA.5199-5200.

The District Court did not engage with this information on its own terms. Instead, it tried to turn the expert reports to the agency's advantage in a manner that the Rule did not claim, reasoning that because a "typical commercial-insurance loss ratio of 50-70% will result in profit margins of about 10-20%," an insurer with a "lower-than-average modified loss ratio" is "likely earning unreasonable profits." RE.64-65 (ROA.24923-24924). That fails twice over. First, the Rule never articulated it, so it is out of bounds under the *Chenery* doctrine. *See* 318 U.S. at 87. The Final Rule justified the Loss Ratio Factor as identifying "excessive pricing of premiums and artificially low or nonexistent claims activity," 90 Fed. Reg. at 3540, and expressly stated that the Factor is not "intended to act as a proxy for the actuarial basis of premium pricing," *id.* at 3541. Second, the District Court's inference is wrong on its own terms. The Rule's formula compares "liabilities incurred for insured losses" against "premiums earned," 26 C.F.R. § 1.6011-11(c)(2), and so captures only liabilities from insured events that have already occurred. Treating the gap between premiums earned and losses incurred as profit assumes that whatever has not been paid out has been kept, but for an insurer bearing a risk that has not materialized,

31

those funds remain exposed—the captive is obligated to pay if the insured event occurs, and the ratio reflects only that the event has not happened yet. *See R.V.I.*, 145 T.C. at 227 ("An insurer may go many years without paying an earthquake claim; this does not mean that the insurer is failing to provide 'insurance.'").

The Court's *sua sponte* related inference—that because captives lack the marketing and distribution costs of commercial carriers they "should have higher loss ratios," RE.65 (ROA.24924)—not only violates the *Chenery* doctrine but conflates cost structure with loss experience. The Rule's modified loss ratio compares incurred losses to premiums earned less policyholder dividends, and for low-frequency, high-severity coverage, the numerator is governed by whether the insured event occurred within the computation window, not by the insurer's overhead or premium level. A captive can therefore price catastrophic risk actuarially and still report a low loss ratio in years when no catastrophe strikes—a point that the Rule itself concedes. *See* 90 Fed. Reg. at 3541 ("low loss ratios may be the result of coverage of low-frequency, high-severity risks").

*The NAIC Data*. The Rule's remaining support for the 60% threshold is a dataset published by the National Association of Insurance Commissioners ("NAIC"). The NAIC publishes industry-wide average loss ratios drawn from annual statements filed by commercial property-and-casualty insurers. *See* 90 Fed. Reg. at 3542. IRS observed that industry-wide annual loss ratios ranged between 67.2% and 76.2% from 2012 to 2021, removed certain high-frequency coverage lines that captives do not write, arrived at an adjusted figure of approximately 66%, and set the Rule's threshold at 60%. *Id.* The Rule's premise is that a captive whose loss ratio falls just below the commercial *average* from an inapposite dataset thereby shows "excessive pricing of premiums and artificially low or nonexistent claims activity." 90 Fed. Reg. at 3540. That premise is egregiously wrong for multiple, independently fatal reasons, and so supplies no "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted).

*First*, the NAIC dataset does not contain captives at all. The NAIC compiles statements filed by commercial carriers; micro-captives are generally not required to file them, and most do not. *See* ROA.5146-5147; *see also* ROA.7026. As the American Academy of Actuaries explained to

the agency, the "NAIC profitability study specifically does not include experience for the vast majority of captive insurance companies, including microcaptive[s]." ROA.5147. The population that IRS measured is therefore not the population that it regulated.

These two populations differ in precisely the respects that determine a loss ratio. Commercial carriers sell high-frequency coverage—auto, homeowners, and the like—to large pools of unrelated policyholders, and they carry the marketing, distribution, and overhead costs that come with that business. *See* ROA.5147. Captives often insure low-frequency, high-severity risks for a single business, and so have "much lower loss ratios" "by structure and design." ROA.5570; ROA.5205. IRS's own actuarial expert described commercial insurance as a "completely different financial proposition" from captive insurance. ROA.5205. Comparing the two does not reveal whether a captive's premiums are excessive; it reveals only that a captive is not a commercial carrier. IRS thus did not "examine the relevant data," *State Farm*, 463 U.S. at 43, and its criteria bear "no apparent relation" to the standard it claims to apply, *Suncor*, 50 F.4th at 1357–58.

34

*Second*, the NAIC reports themselves disclaim the use to which IRS put them. They state that their figures "cannot and should not be used to determine whether current rates are adequate to cover future costs," ROA.6235, and that "[i]t is important to interpret the results in the context of each business line's underlying characteristics," ROA.6239.

The Tax Court has likewise rejected cross-industry benchmarking of this kind, holding that measuring a captive against commercial-insurer figures is "useless" because the two differ structurally. *CFM Ins., Inc. v. Comm'r*, T.C. Memo. 2025-83, 2025 WL 2207492, at \*30 (Aug. 4, 2025) (comparing micro-captive premium-to-surplus ratio to commercial carriers is "useless" because those carriers "face more competition" and so operate on different margins); *see Rent-A-Ctr., Inc. v. Comm'r*, 142 T.C. 1, 12 (2014).[8] IRS's expert in that case agreed, noting that comparisons to "comparable commercial policies would not be appropriate" when evaluating captive-insurance policies. *CFM*, 2025 WL 2207492, at \*30.

---

[8] The District Court dismissed *CFM* because a "premium-to-surplus ratio is not the same as a loss ratio." RE.63 (ROA.24922). That is true but beside the point. The Tax Court rejected the comparison not because of the particular ratio at issue, but because commercial insurers operate differently in ways that shape whatever figure is compared, *see CFM*, 2025 WL 2207492, at \*30—reasoning that applies with equal force to loss ratios.

The Rule did not defend the data's relevance, answering only that "commenters did not point to, and the IRS is not aware of, an alternative publicly-available data set that would be more appropriate." 90 Fed. Reg. at 3542. That inverts the APA's burden structure: the agency must justify its rule and commenters need not disprove it. *See State Farm*, 463 U.S. at 43.

And, of course, commenters did offer alternatives. They submitted a dataset compiled by AM Best (a credit-rating agency specializing in the insurance industry) for small insurers, which shows that the majority (61%) of small insurers have a nine-year average loss ratio below the proposed 65% threshold. ROA.5500. The agency rejected it because AM Best's insurers cover risks "micro-captives are not generally permitted to cover, such as personal automobile liability and homeowner's liability"—**the same defect that commenters identified in the NAIC data that the agency chose to use to justify the Rule**. 90 Fed. Reg. at 3542; *see* ROA.5147. An agency cannot reject one dataset for a flaw that applies with equal force to a dataset that the agency relies upon. *See ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (no reasoned decision-making where the agency "cannot satisfactorily explain why a challenged

36

standard embraces one potential application but leaves out another, seemingly similar one"). Commenters also supplied the very analysis that the agency should have performed, isolating from IRS's own NAIC data source the coverage lines that captives actually write and determining that 63.7% of all line-state combinations fell below 65%. ROA.5494-5495; ROA.5147.

*Third*, even on its own terms, the Rule's reliance on the NAIC data does not support its central conclusions. The agency's adjusted industry figure was approximately 66%, 90 Fed. Reg. at 3542, so a 60% threshold sits within a few points of what IRS itself calculated to be the commercial *norm*—and IRS has elsewhere put the "normal range" at "50-70%." ROA.17048. **The Rule does not even attempt to explain why a captive performing at about the commercial average for non-life insurers is "consistently associated with transactions that are or may be tax avoidance transactions."** 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55.

The District Court accepted the NAIC data as a reasonable "starting point," RE.64 (ROA.24923), but never confronted the numerous, critical defects that make the data irrelevant. The Court did not dispute

37

that both datasets measure the wrong population. It distinguished AM Best only because it was a "table" rather than a modifiable "published data set." RE.63-64 (ROA.24922-24923) (quoting 90 Fed. Reg. at 3542). But that concedes the point that both datasets measure a different population. And while the Court observed that the agency had made "reasonable adjustments" by removing coverage lines that captives do not write, RE.63 (ROA.24922), trimming an irrelevant dataset does not make it "relevant," *see State Farm*, 463 U.S. at 43. Removing coverage lines changes the mix of policies in the dataset, but it does not change the population of insurers, which still does not include captives.

In all, the agency offered no record basis for its conclusion that a captive with a less than 60% loss ratio "consistently gives rise to tax avoidance," 90 Fed. Reg. at 3555, or that such a ratio reflects "excessive pricing of premiums" or "artificially low or nonexistent claims activity," *id.* at 3540. Its reliance on the 60% Loss Ratio Factor is therefore arbitrary and capricious. *See State Farm*, 463 U.S. at 43.[9]

---

[9] The 60% threshold is not only unsupported but creates perverse incentives. The Rule pressures captives to lower premiums, pay policyholder dividends, or manufacture claims solely to raise their loss ratios above the threshold—the very practices that sound insurance

**B.    IRS's Reliance On The Financing Factor Is Arbitrary And Capricious**

A transaction satisfies the Financing Factor if the captive conveys any portion of its premium income to a related party—by loan, guarantee, or other transfer of capital—in a transaction producing no taxable income.  90 Fed. Reg. at 3560; 26 C.F.R. § 1.6011-11(c)(1).  Because the Transaction of Interest test is disjunctive, a captive that satisfies the 20% Relationship Test becomes a transaction of interest based solely on the loan, no matter how high the captive's loss ratio or how plainly arm's-length the loan's terms are.  *See* 90 Fed. Reg. at 3559–61.  But legitimate captives routinely invest their premium reserves in related-party arrangements, with AM Best reporting that for many single-parent captives, "invested assets are composed almost entirely of loan-back arrangements with the parent."  ROA.14712.  The sources that IRS relied upon in the Rule do not support its conclusion that this Factor is "consistently associated with transactions that are or may be tax avoidance transactions."  *Id.* at 3546; *id.* at 3538–39, 3554–55.

---

regulation is designed to prevent, and which may violate state solvency requirements.  ROA.5100; ROA.4911-4912.

39

*The Tax Court Cases*. The three Tax Court decisions that the Rule cites to support this building block—*Avrahami, Swift*, and *Patel*—do not offer the agency any support. 90 Fed. Reg. at 3546. None has held (or even suggested) that micro-captives engaging in related-party financing are "consistently associated with transactions that are or may be tax avoidance transactions." *Id.*; *see id.* at 3538–39, 3554–55. *Avrahami* held that the captive's related-party financing was a *bona fide* debt obligation and was not abusive, even as it found other deficiencies in the arrangement. *Avrahami v. Comm'r*, 149 T.C. 144, 199–204 (2017). What troubled the Tax Court was that over "65% of [the captive's] assets were tied up in long-term, illiquid, and partially unsecured loans to related parties," made without advance regulatory approval—jeopardizing the captive's ability to pay claims. *Id.* at 192–93 & n.41. In *Swift*, the captives' investments drew scrutiny not because the counterparty was related but because the holdings were "so illiquid" that the owner had to issue a put option to guarantee the captives could meet claims, leaving them with assets "that could not be accessed to pay claims." *Swift v. Comm'r*, T.C. Memo. 2024-13, 2024 WL 378671, at *22 (Feb. 1, 2024). And the Rule cites *Patel* for the captive's purchase of a life insurance

policy—a premium paid to a commercial insurer, recited in the court's findings of fact, and never analyzed as a conveyance to a related party. 2024 WL 1270772, at *7.

These cases turned on liquidity—whether the captive's assets could be reached to pay claims—and the Financing Factor asks nothing about liquidity. It asks only whether premium income reached a related party without generating taxable income. 26 C.F.R. § 1.6011-11(c)(1). A captive that ties up two-thirds of its assets in decade-long unsecured loans without telling its regulator is thus arbitrarily treated the same as one making a fully secured, regulator-approved loan repayable on demand. *See id.* Three decisions turning on a feature that the Factor does not measure cannot establish that the feature it *does* measure is "consistently associated with transactions that are or may be tax avoidance transactions." 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55.

Nor does the rest of the record. It shows the opposite: again, for many single-parent captives, "invested assets are composed almost entirely of loan-back arrangements with the parent." ROA.14712. A feature common to legitimate captives does not identify transactions that are "consistently associated with transactions that are or may be tax

41

avoidance transactions," 90 Fed. Reg. at 3546; it identifies the ordinary operation of a closely held insurer. And while the District Court claimed that the Financing Factor supposedly "captures many transactions in which the 'key abuses' occur," RE.57 (ROA.24916), none of these cases— or anything else in the administrative record—supports that assertion.

*The Agency's Unspecified "Experience"*. The Rule also purported to support this building block by claiming that in its "experience," "financing arrangements that create a tax-deferred circular flow of funds are indicative of tax avoidance." 90 Fed. Reg. at 3546. But the Rule never identifies what that experience revealed—how many examined captives engaged in related-party financing, what proportion were found abusive, or whether financing correlated with abuse at all. A bare invocation of "experience," untethered to any disclosed, reviewable data, cannot support a rule under the APA. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1137 (5th Cir. 2021).

The District Court erred in holding otherwise. Citing to *Safari Club International v. Haaland*, 31 F.4th 1157, 1173 (9th Cir. 2022), the Court reasoned that an agency may "rely on its experience, even without having quantified it in the form of a study," and that a declaration stating that

42

IRS had consulted taxpayer files that it could not disclose was "likely sufficient," RE.58 (ROA.24917). But in *Safari Club*, the agency disclosed the studies and data that it relied upon, and the Ninth Circuit simply excused a formal study. 31 F.4th at 1167, 1173–74. Here, the Rule discloses nothing that can be tested in APA litigation. A declaration that undisclosed materials were consulted establishes that IRS looked at something; it does not explain what the files showed or "how that experience supports the promulgated regulation." *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021). The particular statutory provision that the agency has proffered for its refusal to disclose any facts or data underlying its decision—26 U.S.C. § 6103(b)(2)—may explain why taxpayer-specific files are absent from the record, but it does not permit an agency to rest a rule on an empirical claim that cannot be tested in APA review, *see In re NTE Conn., LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022) ("The APA does not contain a confidentiality loophole.").[10]

---

[10] The District Court also supplied two rationales for the Financing Factor that the Rule never offered: that a circular flow of funds may leave the insurer without adequate reserves, RE.47 (ROA.24906), and that a narrower Financing Factor could be evaded, RE.59 (ROA.24918).

43

*Policy Disagreement With Congress' Tax Structure.* The Rule's remaining rationale for the Financing Factor reduces to IRS's policy disagreement with the statutory scheme that Congress created. The Rule's stated concern is the "continuing deferral of tax" that results when premiums flow from the insured (deducted under Section 162) to the captive (excluded from income under Section 831(b)) and then return through non-taxable financing. 90 Fed. Reg. at 3546. But it is *Congress* that authorized the premium deduction, *Congress* that enacted the Section 831(b) exclusion, and *Congress* that determined that loans do not typically constitute taxable income. The "circular flow" that IRS decries is just the intended operation of that framework, and a taxpayer's decision to take advantage of congressional choices is not indicative of tax abuse. *See Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 787 (6th Cir. 2017). The agency may not use a disclosure regime to enforce its disagreement with the tax treatment that Congress prescribed.

---

Neither appears in the Rule and thus the District Court violated the *Chenery* doctrine again by relying upon them. The first rationale, moreover, is the claims-paying inquiry discussed in the caselaw but that the agency declined to adopt. *See* 90 Fed. Reg. at 3546.

44

C.    **IRS's Reliance On The 20% Relationship Test Is Doubly Unlawful**

1.    **IRS's Use Of The 20% Relationship Test Is Arbitrary And Capricious**

Like the other two building blocks, the 20% Relationship Test lacks any administrative record support. A captive satisfies this Test if at least 20% of its total assets, voting power, or equity interests is held, directly or indirectly, by an insured, an owner, or a related person. 90 Fed. Reg. at 3562; 26 C.F.R. § 1.6011-11(b)(1)(iii) (defining "Captive" as having same meaning as in § 1.6011-10(b)(1)). IRS identified no record basis for concluding that this Test identifies transactions "consistently associated with transactions that are or may be tax avoidance transactions," 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55. Indeed, the Rule points to nothing at all in the record supporting the view that any degree of common ownership is consistently associated with transactions that may be tax avoidant—let alone 20%.

*The Agency's Predictive Rationale*. The agency's principal rationale is predictive—that common ownership heightens the risk of a sham arrangement because, in closely held entities, there is "little to no barrier to the manufacture of [insurance] claims." 90 Fed. Reg. at 3551. But a prediction is only as sound as its evidentiary foundation, and the Rule

45

offers none. The agency cites no data showing that captives—which are virtually all closely held, *see* ROA.5772—are "consistently associated with transactions that are or may be tax avoidance transactions." 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55. Moreover, its rationale wrongly conflates ownership structure with abuse. Every related-party transaction involves reduced arm's-length constraints, yet common ownership is fully consistent with legitimate insurance. *See Humana Inc. v. Comm'r*, 881 F.2d 247, 252 (6th Cir. 1989).

To justify a criterion of this kind, the agency would have to show a "delta" in abuse potential between the companies that its threshold flags and those it does not, and the Rule "offer[s] no reason to believe such a delta exists." *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 179 (5th Cir. 2024) (en banc). Absent record evidence connecting common ownership generally, and the 20% threshold more specifically, to tax abuse, the agency's assertion that this Test "strongly indicate[s] tax avoidance," 90 Fed. Reg. at 3554, is precisely the kind of unsupported prediction that *State Farm* forbids, *see* 463 U.S. at 43.

*The Agency's Exclusionary Rationale*. The agency's remaining rationale—that the Test serves an "exclu[sionary]" function by screening

46

out diversified insurers such as mutual insurers, 90 Fed. Reg. at 3555—fares no better. The entities that the agency invokes (mutual insurers, "groups of farmers," and "fire associations"), *id.*, are not captives, and bear none of the closely held characteristics that typically define a captive. Screening out non-captives says nothing about whether captives that satisfy the Test are "consistently associated with transactions that are or may be tax avoidance transactions." *See id.* at 3546.

The same is true of other entities that the Rule acknowledges are unlikely to satisfy the Test, such as risk retention groups and commercially rated programs. *Id.* at 3552. These structures involve diversified ownership, which is precisely why they would not trigger the 20% Relationship Test. *See* 26 U.S.C. § 831(b)(2)(B)(i)(I)–(II). The Test excludes entities that Congress' first diversification pathway already covered, while capturing the closely held captives for which Congress wrote the second. *See supra* Part I.C.2. A purported gating element that operates that way identifies no fact pattern "consistently associated with transactions that are or may be tax avoidance transactions," 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55, and is arbitrary and capricious, *see State Farm*, 463 U.S. at 43.

47

The District Court's reasons for upholding the Test do not withstand scrutiny. It credited the exclusionary rationale, reasoning that the Test screens out "small insurers" that "do not pose a high risk of tax evasion." RE.55 (ROA.24914). But this answers the wrong question. That a criterion screens some entities out says nothing about whether those it retains are "consistently associated with transactions that are or may be tax avoidance transactions." 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55. Nor can the rationale explain the line that the agency drew: entities with dispersed ownership fall outside a 5% threshold as readily as a 20% one, so the exclusion the Court credited would justify any figure at all.[11] And while the Court reasoned that the Test purportedly "helps identify tax-avoidance transactions" because the "risk" of a sham "is heightened when the insurer and the insured are under common ownership," RE.55 (ROA.24914), that is not the standard that IRS set for itself—which requires a fact pattern "consistently associated" with tax avoidance, 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55. It is also a

---

[11] Indeed, the Court did not address the 20% figure—neither its apparent derivation from a statutory provision measuring premium concentration, *see* ROA.12013, nor why that figure should identify abusive ownership.

48

proposition that IRS disclaimed below, stating that "Treasury does not contend that closely-held captives are more likely to be abusive." ROA.24863.

More broadly, the District Court upheld the 20% Relationship Test and the Rule's other Factors because, in its view, the reporting burden is "low." RE.54 (ROA.24913); RE.67-68 (ROA.24926-24927).  But it cited no authority suggesting that purportedly "low" compliance costs relax what the APA requires.  *See All. for Fair Bd.*, 125 F.4th at 184.

### 2.   IRS's Use Of The 20% Relationship Test Is Also Contrary To Law

a. An agency rule is "not in accordance with law" under 5 U.S.C. § 706(2)(A) when it "frustrate[s] the policy that Congress sought to implement."  *Friends of Animals v. Haaland*, 997 F.3d 1010, 1016 (9th Cir. 2021) (citation omitted); *see Miss. Poultry Ass'n v. Madigan*, 992 F.2d 1359, 1364 (5th Cir. 1993); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 (8th Cir. 1979).   After *Loper Bright*, courts independently determine whether an agency has respected these statutory boundaries.  603 U.S. at 412–13.

b. The Final Rule's 20% Relationship Test frustrates Congress' policy judgment by treating as a marker of suspicion the very ownership

49

structure that Congress authorized. *See Friends of Animals*, 997 F.3d at 1016. The PATH Act created two alternative ways for captives to satisfy the statute's diversification requirement. Under the first, no more than 20% of net written premiums may be attributable to any one policyholder. 26 U.S.C. § 831(b)(2)(B)(i)(I). The second is available to captives that cannot meet that test, and turns instead on relative ownership: the captive qualifies so long as its owners and their family members hold no greater interest in the captive than they hold in the insured business. *Id.* § 831(b)(2)(B)(i)(II); *see* S. Rep. No.114-16, at 3 (2015). Congress thus made an affirmative judgment that captives with a concentrated premium base may elect Section 831(b) through the relatedness test, without the premium diversification that the risk-diversification test requires. *See* ROA.6149.

The 20% Relationship Test turns that congressional judgment on its head, turning the very ownership structure that Congress authorized into a regulatory negative. A captive is, by definition, owned by the businesses it insures, *see Del. Dep't of Ins.*, 66 F.4th at 116 n.1, and in a typical captive the same people own the operating business and the captive, *see* ROA.5571 ("Historically, small captives have been owned

50

only by a single insured entity."); ROA.24593-24594 ("The owners of a captive insurance company are also the owners of the particular business being insured."). The Rule asks whether related persons hold at least 20% of the captive's assets, voting power, or equity, and its family-attribution rules make that threshold particularly easy to cross: the Test aggregates the interests of related persons, *see* 90 Fed. Reg. at 3560, 3562, so that a father holding 15% and a daughter holding 10% cross the line together, though neither would alone. And the captives that need the relatedness test are precisely those that will exceed the Rule's 20% threshold.

That result undermines the PATH Act's relatedness test. A closely held captive that insures low-frequency risks or makes ordinary loans to its parent cannot escape classification unless it restructures to diversify its premiums among unrelated policyholders—that is, unless it abandons the relatedness test and satisfies the risk-diversification test instead. But Congress created the relatedness test precisely for the captives that cannot do that. The Rule thus recasts a structure that Congress deemed a permissible path to Section 831(b) benefits as a marker of potential abuse.

IRS's defense—that "the PATH Act diversification requirements are not sufficient to eliminate the possibility that a transaction is or may be a tax avoidance transaction," 90 Fed. Reg. at 3554—proves too much. No statutory eligibility test eliminates the possibility of abuse. A taxpayer that claims the mortgage-interest deduction could fabricate the underlying obligation, and a taxpayer who funds a retirement account could overvalue the assets. On this logic, IRS could designate *every* Code-compliant transaction as a transaction of interest, subject only to APA arbitrary and capricious review, because no eligibility requirement guarantees against fraud. That cannot be right, and is especially wrong here, where Congress did not merely tolerate the relatedness structure but affirmatively created it as a pathway to the election. *See Friends of Animals*, 997 F.3d at 1016; *Summa Holdings*, 848 F.3d at 787.

Notably, Congress considered and rejected a "related proposal that would narrow eligibility to elect the alternative tax in a manner intended to address abuse potential, but that may cause problems for certain States." ROA.6150. The Final Rule adopts substantially the approach that Congress rejected—narrowing eligibility for closely held captives by imposing regulatory consequences on the very ownership structure that

Congress authorized. Members of the committee with jurisdiction over tax legislation confirmed as much, writing that the Rule "would effectively eliminate the section 831(b) election for all or most small captive insurance companies" and that "[t]he IRS may not eliminate laws that it finds inconvenient to administer . . . nor may it legislate via regulation." ROA.14750-14751.

c. The District Court's contrary analysis misreads what Congress did in the PATH Act. The Court began from the premise that Sections 162(a) and 831(b) are generally applicable provisions that nowhere authorize benefits for captives specifically. RE.40-41 (ROA.24899-24900). But the PATH Act's relatedness test is not generally applicable. It operates only for insurers that fail the premium-diversification alternative—that is, for captives whose premiums come predominantly from related policyholders. And Congress wrote it in terms of ownership: such an insurer qualifies so long as its owners and their families hold no greater interest in the insurer than in the insured business. 26 U.S.C. § 831(b)(2)(B)(i)(II). That is a judgment about which ownership structures warrant the election, and it addresses the same subject matter as the Rule's 20% Relationship Test.

53

Nor does the principle that a legislature may proceed "one step at a time," RE.42 (ROA.24901) (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)), bear the weight that the District Court placed on it. That canon recognizes Congress' ability to address a problem incrementally, so that a court will not read a partial solution as blessing everything outside its reach. *See Williamson*, 348 U.S. at 489. It does not apply where, as here, Congress addressed the question and chose one answer over another. Congress took up the diversification of closely held captives directly, considered the Joint Committee's proposal to require premium diversification of all electing captives, and declined it in favor of an ownership-based alternative. ROA.6149-6150; *see* S. Rep. No.114-16, at 3 (2015). The Court did not discuss that history, instead relying on the Joint Committee's expectation that Treasury would issue "anti-abuse rules" preventing "attempts to characterize as premiums any income that is other than premium income." RE.43 (ROA.24902). But anticipating rules aimed at misuse is not authorization to treat the qualifying ownership structure itself as a marker of suspicion.

54

## II. The District Court's Misreading Of Section 6707A(c)(1) Cannot Save The Rule

### A. The District Court Violated The *Chenery* Doctrine By Upholding The Rule Based Upon A Statutory Reading That The Agency Did Not Rely Upon, And Which Would Not Save The Rule In Any Event

Before the District Court, the parties' disputes as to Plaintiffs' arbitrary-and-capricious claims were about the state of the administrative record, not the meaning of Section 6707A(c)(1).[12] The Rule explained that the Transaction of Interest regulation's building blocks identify fact patterns "consistently associated with transactions that are or may be tax avoidance transactions," 90 Fed. Reg. at 3546; *id.* at 3538–39, 3554–55, and IRS defended the Rule on that basis, arguing that the building blocks were permissible because they "are consistently found in arrangements that do not provide insurance for federal income tax purposes," ROA.24796; *see* ROA.24803; ROA.24863. Plaintiffs argued that the record does not support that claim. ROA.24747-24759.

The District Court charted a different course. Recall that Section 6707A(c)(1) permits IRS to designate transactions "of a type which the

---

[12] As to Plaintiffs' *statutory* claim, the parties did dispute whether Section 6707A(c)(1) may be read without regard to Congress' judgment in Section 831(b) and the PATH Act, but that is a different claim and issue. *See* ROA.24741-24746; *supra* Part I.C.2.

Secretary determines as having a potential for tax avoidance or evasion."

26 U.S.C. § 6707A(c)(1). Rather than decide whether the record

supported the determination that the agency made under that language,

the Court construed the statute to fix what the Court viewed as the outer

boundary of the agency's authority, and then asked whether the record

could support a rule built at that outer boundary. It held that "potential"

in Section 6707A(c)(1) is a "low bar" that requires nothing "probable,

more likely than not, or even plausible," and is satisfied whenever a

transaction "'may' allow an individual or entity to avoid paying taxes

when they should have." RE.37-38 (ROA.24896-24897). It held that "of

a type" expands the agency's authority by "allow[ing IRS] to designate

transactions at a higher level of generality." RE.49 (ROA.24908).

Applying that capacious construction, the Court held that the agency's

"finding that some transactions that satisfy § 1.6011-11's disjunctive test

are tax-evasive" was "sufficient to conclude that § 1.6011-11 is within the

agency's statutory authority." RE.48-49 (ROA.24907-24908).

That approach violates the *Chenery* doctrine because it is not the

ground on which the agency acted. The Rule nowhere claims authority

to designate a category in which merely *some* transactions *might*

56

plausibly be abusive. The agency told the public after notice-and-comment rulemaking that its adopted building blocks identify fact patterns "*consistently* associated with transactions that are or may be tax avoidance transactions." 90 Fed. Reg. at 3546 (emphasis added); *id.* at 3538–39, 3554–55.[13] That is the benchmark against which the Rule must be measured under the APA, *Chenery*, 318 U.S. at 87, and it clearly fails under that benchmark for the reasons explained above, *supra* Part I.

To be clear, Plaintiffs do not dispute that courts independently interpret the scope of an agency's statutory authority. *See Loper Bright*, 603 U.S. at 412–13. But a court may not lower an agency's self-imposed basis for issuing a rule and then sustain the rule based on the claim that the record satisfies that lowered bar. *See Louisiana*, 90 F.4th at 469.

In any event, it is still worth noting that the administrative record so clearly refutes the Rule's building blocks that this record could not

---

[13] In defending the Final Rule below, the agency repeatedly reiterated the standard that the Rule (and not the District Court) applied, stating that "Treasury found that not-real insurance arrangements typically have low modified loss ratios and financing arrangements," ROA.24863, and that "Treasury identified the captive's modified loss ratio and the presence of a financing agreement between the captive and the insureds (or related parties)," "when present in a closely-held arrangement," as "consistently found in arrangements that do not provide insurance for federal income tax purposes," ROA.24796.

even satisfy the District Court's capacious reading of Section 6707A(c)(1).

On the 60% Loss Ratio, the record shows that having such a loss ratio *favors* (rather than undermines) a finding that the captive is providing insurance. *Supra* Section I.A. On the Financing Factor, the three Tax Court decisions show nothing relevant about this Factor, and IRS's reliance on its unspecified experience remains legally impermissible under APA caselaw regardless of how broadly one reads Section 6707A(c)(1). *Supra* Section I.B. And as for the 20% Relationship Test, IRS identified no data supporting that Test, meaning that the Test violates the APA no matter how low the statutory bar under Section 6707A(c)(1). *Supra* Section I.C.1.

## B. IRS's Authority Under Section 6707A(c)(1) Is Not As Capacious As The District Court Claimed

The District Court's construction of Section 6707A(c)(1) is wrong, in any event. Properly read, Section 6707A(c)(1) permits IRS to do what the Rule claimed it was doing: require disclosure of transactions that are "*consistently* associated with transactions that are or may be tax avoidance transactions." 90 Fed. Reg. at 3546 (emphasis added); *id.* at 3538–39, 3554–55.

1. Statutory interpretation "begins, of course, with the plain language," *Moore v. Cain*, 298 F.3d 361, 366 (5th Cir. 2002) (citation omitted), words carry their ordinary meanings, *United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019), and no term should be read to have no consequence, *United States v. Palomares*, 52 F.4th 640, 644–45 (5th Cir. 2022). In addition, when an agency claims power of "vast economic and political significance" from a general statutory provision, it "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 716, 723, 732 (2022) (citation omitted); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

2. Section 6707A(c)(1) defines a "reportable transaction" as one that "is of a type which the Secretary determines as having a potential for tax avoidance or evasion." 26 U.S.C. § 6707A(c)(1). Two operative terms— "of a type" and "potential"—together require IRS to show that the defining characteristics of the designated group are consistently associated with tax avoidance.

Start with "of a type." A "type" is a group defined by shared characteristics that distinguish it from what lies outside the group. *Type*, Oxford English Dictionary (defining "type" as a "general form, structure,

or character distinguishing a particular kind, group, or class of beings or objects")[14]; *see Matter of GFS Indus., L.L.C.*, 99 F.4th 223, 228 n.5 (5th Cir. 2024) (defining the synonym "kind" as a "group united by common traits or interests" (citation omitted)).  Two propositions follow.  First, the characteristics must be common to the group's members—a trait that only some members exhibit describes those members, not the type.  Second, the characteristics must distinguish the group from transactions outside it, as traits equally common among non-type transactions mark nothing.  *See Whirlwind Mfg. Co. v. United States*, 344 F.2d 153, 156 (5th Cir. 1965) (sustaining regulation taxing "articles of the household type" because it tied the category to the very characteristic that defines it).  In short, "of a type" requires IRS to identify characteristics that consistently mark the designated transactions and set them apart.

Now add "potential."  A "potential" is not a bare possibility; it is a capacity that inheres in the thing described.  *Potential*, Oxford English Dictionary (defining "potential" as "having or showing the capacity to

---

[14]    Available at https://www.oed.com/dictionary/type_n?tab= meaning_and_use&tl=true (subscription required) (all websites last visited August 10, 2026).

60

develop into something in the future").[15]  A capacity is a property of the thing said to possess it—for example, glass is capable of shattering because of what glass is.  So a type "having a potential for tax avoidance or evasion" is one whose defining characteristics create that capacity.  *See King v. Time Warner Cable Inc.*, 894 F.3d 473, 478 (2d Cir. 2018) ("capacity" refers to capacity "to cause the problem that is the subject of legislative concern, rather than addressing itself to the hazily defined universe of things that have only a theoretical potential to do so"); *Ala. Power Co. v. Costle*, 636 F.2d 323, 353–54 (D.C. Cir. 1979) ("potential to emit" must be measured by present "design capacity" because otherwise "the actual emissions calculation called for by the verb 'emit' would lose all significance").[16]

---

[15] Available at https://www.oed.com/dictionary/potential_adj?tab=meaning_and_use#29047648 (subscription required).

[16] The verb "determines" supplies an additional constraint.  Section 6707A(c)(1) does not authorize designation of transactions that happen to carry a potential for tax avoidance; it authorizes designation of transactions of a type that "the Secretary determines" to have one.  A determination is a conclusion reached on some basis, and in the APA setting that basis must appear in the administrative record.  *See State Farm*, 463 U.S. at 43.

Putting those terms together, "of a type" requires shared, distinguishing characteristics, and "potential" requires that those characteristics create a genuine capacity for abuse.[17] The result is the standard that the Rule announced for itself: IRS must identify features "*consistently associated* with transactions that are or may be tax avoidance transactions." 90 Fed. Reg. at 3546 (emphasis added); *id.* at 3538–39, 3554–55.

3. The District Court's contrary construction is wrong. Each of the Court's interpretive moves had the same effect, reducing Section 6707A(c)(1) from a provision that requires IRS to identify a group consistently associated with tax avoidance to something far less.

The District Court held that "of a type" broadens IRS's authority by "allow[ing IRS] to designate transactions at a higher level of generality," such that "it is immaterial that some of the individual transactions within that type do not have the potential for tax avoidance or evasion." RE.49 (ROA.24908). That eliminates the consistency requirement by

---

[17] Again, IRS itself agrees with this interpretation of Section 6707A, arguing below that an "illegitimate § 831(b) captive can consistently be distinguished from its legitimate cousin" based upon the Rule's Factors and Test. ROA.24803.

treating breadth as a virtue rather than a constraint. On the Court's construction, the broader the "type" that IRS defines, the more secure its authority, because a larger grouping is more likely to contain a few abusive transactions somewhere within it. But Congress used "of a type" to limit IRS's authority, not to expand it. *See supra* pp.59–60.

The Court also collapsed "potential" into mere conceivability, holding that "potential" sets "a low bar" requiring nothing "probable, more likely than not, or even plausible" and is satisfied whenever a transaction "'may' allow an individual or entity to avoid paying taxes when they should have." RE.37-38 (ROA.24896-24897). That drains the word "potential" of its meaning. The Court reached this conclusion through a substitution: having quoted Black's definition of *Potential*, it added a second definition—"[a]n event that may or may not happen"— drawn from that dictionary's separate entry for *Possibility*. RE.37 (ROA.24896). But Congress wrote "potential," not "possibility." *See Lauderdale County*, 914 F.3d at 966.

The consequences of the District Court's construction confirm that it is wrong. If "of a type" means that breadth strengthens the designation, and "potential" means nothing more than bare theoretical

63

possibility, then Section 6707A(c)(1) imposes no meaningful constraint on IRS's power to compel disclosures from the Nation's taxpayers. *See West Virginia*, 597 U.S. at 716, 723, 732; *Util. Air*, 573 U.S. at 324. Any sufficiently broad category of transactions will contain some that are abusive—for instance, mortgage-interest deductions, retirement-account contributions, charitable donations—and on the Court's reading, that is enough. IRS would have carte blanche to designate any category that it chooses as a "transaction of interest," subject only to APA arbitrary-and-capricious review. Congress did not write Section 6707A(c)(1) to grant IRS roving authority over every taxpayer. It required IRS to identify a "type"—a group whose defining features are consistently associated with abuse—and make a determination supported by the record that those features create a genuine capacity for abuse. The Court's construction reads those provisions out of the statute.

*      *      *

In all, while the District Court correctly vacated the Rule's Listed Transaction portion, it legally erred in upholding the Transaction of Interest portion. Because the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," this Court should

64

order the district court to "set aside" the Rule in its entirety.  5 U.S.C. § 706(2)(A); *see Data Mktg.*, 45 F.4th at 859.

## CONCLUSION

This Court should reverse the District Court's decision upholding 26 C.F.R. § 1.6011-11 and remand with instructions to vacate the Final Rule's Transaction of Interest portion in its entirety.

Date: August 10, 2026

Respectfully submitted,

*/s/ Misha Tseytlin*

David B. Dove
**TROUTMAN PEPPER LOCKE LLP**
600 Peachtree Street, N.E.
Suite 3000
Atlanta, GA 30308
(404) 885-3680
david.dove@troutman.com

Chris Verducci
**TROUTMAN PEPPER LOCKE LLP**
Suite 2800
JP Morgan Chase Tower
Houston, TX 77002
(713) 226-1548
chris.verducci@troutman.com

Misha Tseytlin
*Counsel of Record*
**TROUTMAN PEPPER LOCKE LLP**
225 W Randolph Street
Suite 2600
Chicago, IL 60606
(312) 759-1920
misha.tseytlin@troutman.com

*Counsel to Plaintiffs-Appellants/Cross-Appellees Drake Plastics Limited Company, Drake Insurance Company, and Strategic Risk Alternatives, L.L.C., doing business as SRA 831(b) Admin*

# CERTIFICATE OF SERVICE

The undersigned certifies that on this 10th day of August 2026, the foregoing was filed electronically and served on counsel of record through the Court's ECF filing system.

*/s/ Misha Tseytlin*
Misha Tseytlin

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), this document complies with (1) the word limits of Federal Rule of Appellate Procedure 32(a)(7)(B), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,791 words; and (2) the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this document has been prepared in a proportionally spaced typeface (14 point, Century Schoolbook font) using Microsoft Word.

*/s/ Misha Tseytlin*
Misha Tseytlin