# 26-20219

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**DRAKE PLASTICS LIMITED COMPANY, DRAKE INSURANCE COMPANY, and STRATEGIC RISK ALTERNATIVES, L.L.C., doing business as SRA 831(B) ADMIN,**

**Plaintiffs-Appellants/Cross-Appellees**

**v.**

**INTERNAL REVENUE SERVICE, COMMISSIONER OF INTERNAL REVENUE, DEPARTMENT OF THE TREASURY, and SCOTT BESSENT, in his official capacity as Secretary of the Treasury,**

**Defendants-Appellees/Cross-Appellants**

---

**ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS**

---

## PRINCIPAL AND RESPONSE BRIEF FOR THE APPELLEES/CROSS-APPELLANTS

---

BRETT A. SHUMATE
*Assistant Attorney General*
JOSHUA WU
*Deputy Assistant Attorney General*

FRANCESCA UGOLINI (202) 514-3361
ELLEN PAGE DELSOLE (202) 514-8128
GEOFFREY J. KLIMAS (202) 307-6346
*Attorneys, Tax Litigation Branch*
*Civil Division, U.S. Department of Justice*
*Post Office Box 502, Washington, D.C. 20044*

## STATEMENT REGARDING ORAL ARGUMENT

At issue in this appeal are two regulations designating certain micro-captive insurance arrangements as “transactions of interest” and “listed transactions,” respectively, which means that taxpayers and material advisors must file reports with the Internal Revenue Service affirmatively disclosing their involvement therein. The regulation designating arrangements as “transactions of interest” was upheld by the District Court below, as well as the two other district courts to pass on the regulation’s validity. *Ryan, LLC v. Internal Revenue Serv.*, 2026 WL 1847197 (N.D. Tex. June 26, 2026), *appeal docketed*, No. 26-10708 (5th Cir.); *CIC Servs., LLC v. Internal Revenue Serv.*, 2026 WL 622836 (E.D. Tenn. Mar. 5, 2026), *appeal docketed*, No. 26-5210 (6th Cir.). The regulation designating arrangements as “listed transactions” was vacated nationwide by the District Court below, even though a district court located outside this circuit had previously upheld it. *CIC Servs.*, *supra*. In light of the administrative importance of these issues, counsel for the Government respectfully inform the Court that oral argument would be helpful.

# TABLE OF CONTENTS

**Page**

Statement regarding oral argument ........ i
Table of contents ........ ii
Table of authorities ........ v
Glossary ........ xiv
Statement of jurisdiction ........ 1
Statement of the issues ........ 3
Statement of the case ........ 4

A. The nature of the case and course of proceedings in the District Court ........ 4

B. The relevant facts ........ 6

1. Introduction ........ 6

2. The reportable transaction regime ........ 6

3. Small captive insurance arrangements and the potential for abuse ........ 9

4. Treasury identifies certain micro-captive insurance arrangements as reportable transactions subject to an affirmative disclosure requirement ........ 14

C. Proceedings in the District Court ........ 17

Summary of argument ........ 20
Argument:

Standard of review ........ 24

I This Court should affirm the District Court's judgment upholding Treas. Reg. §1.6011-11 ........ 24

**Page**

A. Introduction: the Administrative Procedure Act .................. 24

B. The District Court correctly held that Treasury engaged in reasoned decisionmaking when it identified certain micro-captive insurance arrangements as transactions of interest .................. 26

1. The standard to identify a new transaction-of-interest category .................. 26

2. Treasury's identification of a new transaction-of-interest category was reasonable and reasonably explained .................. 36

a. The relationship test is reasonable and consistent with the relevant statutory scheme .................. 37

i. The relationship test is reasonable .................. 37

ii. The relationship test is consistent with the relevant statutory scheme .................. 43

b. The loss-ratio and related-party financing factors are reasonable .................. 48

i. The loss-ratio factor is reasonable .................. 48

ii. The related-party financing factor is reasonable .................. 63

C. The District Court should be afforded the opportunity to determine an appropriate remedy for any defect in the transaction-of-interest regulation in the first instance .................. 69

**Page**

II This Court should reverse the District Court's vacatur of Treas. Reg. §1.6011-10; if it finds the regulation invalid, the appropriate remedy is a remand to the District Court for further proceedings ........ 71

A. The District Court erred in holding that Treasury exceeded its authority when it identified certain micro-captive insurance arrangements as listed transactions ........ 71

B. If this Court were to conclude that the listed-transaction regulation is invalid, it should remand the case to the District Court to reconsider the appropriate remedy ........ 78

1. Introduction: vacatur under the APA ........ 79

2. The District Court abused its discretion in vacating the listed-transaction regulation nationwide ........ 81

Conclusion ........ 84

Certificate of compliance ........ 85

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Adkins v. Silverman*,
899 F.3d 395 (5th Cir. 2018) .......................................................1-2
*Alaska Dep't of Envtl. Conservation v. E.P.A.*,
540 U.S. 461 (2004) .......................................................................26
*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020).........................................................2
*AMERCO, Inc. v. Commissioner*,
979 F.2d 162 (9th Cir. 1992) ..........................................................9
*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022)..................................................79, 84
*Ark. AFL-CIO v. F.C.C.*,
11 F.3d 1430 (8th Cir. 1993) .........................................................33
*Avrahami v. Commissioner*,
149 T.C. 144 (2017)..............................13-14, 39, 41, 49, 61, 65-66
*Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*,
462 U.S. 87 (1983) ..........................................................................25
*Barr v. S.E.C.*,
114 F.4th 441 (5th Cir. 2024)..................................................25, 31
*Bates v. United States*,
522 U.S. 23 (1997) ..........................................................................30
*Bell v. Itawamba Cty. School Bd.*,
799 F.3d 379 (5th Cir. 2015) .........................................................24
*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271 (11th Cir. 2015)........................................79
*Bowers v. Lawyers' Mort. Co.*,
285 U.S. 182 (1932) .......................................................................14
*Bruckner Truck Sales, Inc. v. Guzman*,
148 F.4th 341 (5th Cir. 2025).........................................................35
*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......................................................................70
*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) (en banc).........................70, 79, 81-82
*Castille v. Port Arthur ISD*,
168 F.4th 240 (5th Cir. 2026)..........................................40, 61, 63

**Cases (cont'd):** **Page(s)**

*Caylor v. Commissioner*,
T.C. Memo. 2021-30 .... 39, 49, 61, 63
*Cent. & S.W. Servs., Inc. v. U.S. EPA*,
220 F.3d 683 (5th Cir. 2000) .... 80
*CFM Ins., Inc. v. Commissioner*,
T.C. Memo. 2025-83, *appeal docketed at*
No. 26-1067 (7th Cir.) .... 54
*Church of Scientology of Cal. v. I.R.S.*,
484 U.S. 9 (1987) .... 68
*CIC Servs., LLC v. Internal Revenue Serv.*,
2017 WL 6016526 (E.D. Tenn. Apr. 21, 2017) .... 10
*CIC Servs., LLC v. Internal Revenue Serv.*,
2026 WL 622836 (E.D. Tenn. Mar. 5, 2026),
*appeal docketed*, No. 26-5210 (6th Cir.) .... i, 22, 35, 39,
52, 60-62, 73, 75, 77-78, 83
*CIC Servs., LLC v. Internal Revenue Serv.*,
593 U.S. 209 (2021) .... 7, 10-14, 32, 42, 62, 75
*CIC Servs., LLC v. Internal Revenue Serv.*,
592 F. Supp. 3d 677 (E.D. Tenn. Mar. 21, 2022),
*as modified by* 2022 WL 2078036
(E.D. Tenn. June 2, 2022) .... 14-15
*Commissioner v. Soliman*,
506 U.S. 168 (1993) .... 27
*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
45 F4th 846 (5th Cir. 2022) (en banc) .... 79
*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .... 25, 53, 57, 78
*Fleshman v. West*,
138 F.3d 1429 (Fed. Cir. 1998) .... 35
*Green Rock LLC v. Internal Revenue Serv.*,
104 F.4th 220 (11th Cir. 2024) .... 27, 70, 73, 76
*Green v. Sec'y, Dep't of Corrections*,
28 F.4th 1089 (11th Cir. 2022) .... 36
*Harper Group v. Commissioner*,
96 T.C. 45 (1991), *aff'd*,
979 F.2d 1341 (9th Cir. 1992) .... 40

**Cases (cont'd):** **Page(s)**

*Hasie v. Office of Comptroller of Currency*,
633 F.3d 361 (5th Cir. 2011) .......... 25
*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) .......... 80-81
*Helvering v. Le Gierse*,
312 U.S. 531 (1941) .......... 13
*High Cty. Conservation Advocates v. U.S. Forest Serv.*,
951 F.3d 1217 (10th Cir. 2020) .......... 79
*Humana Inc. v. Commissioner*,
881 F.2d 247 (6th Cir. 1989) .......... 41
*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety and Health Admin.*,
920 F.2d 960 (D.C. Cir. 1990) .......... 80
*Keating v. Commissioner*,
T.C. Memo. 2024-2 .......... 39, 49, 61, 64
*Kirschbaum v. Walling*,
316 U.S. 517 (1942) .......... 45
*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 33
*Louisiana v. U.S. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) .......... 33
*Malone & Hyde, Inc. v. Commissioner*,
62 F.3d 835 (6th Cir. 1995) .......... 13-14
*Mann Constr., Inc. v. United States*,
27 F.4th 1138 (6th Cir. 2022) .......... 15, 74
*Mayfield v. U.S. Dep't of Labor*,
117 F.4th 611 (5th Cir. 2024) .......... 32
*MD Pharm., Inc. v. Drug Enforcement Admin.*,
133 F.3d 8 (D.C. Cir. 1998) .......... 68
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......... 24-25, 69
*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
116 F.3d 520 (D.C. Cir. 1997) .......... 68
*Nat'l Mining Ass'n v. United Steel Workers*,
985 F.3d 1309 (11th Cir. 2021) .......... 68

**Cases (cont'd):** **Page(s)**

*In re NTE Conn.*,
26 F.4th 980 (D.C. Cir. 2022) ........................................................ 69
*Patel v. Commissioner*,
165 T.C. 171 (2025), *appeals docketed*,
Nos. 26-60180, 26-60181, & 26-60194 (5th Cir.) .................... 13, 65
*Patel v. Commissioner*,
T.C. Memo. 2024-34 ........................................................ 39, 50, 65
*Pension Benefit Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990) ............................................................... 47
*PHH Mortgage Corp. v. Old Republic Nat'l Title Ins. Co.*,
80 F.4th 555 (5th Cir. 2023) ......................................................... 82
*R.V.I. Guar. Co. & Subsidiaries v. Commissioner*,
145 T.C. 209 (2015) .............................................................. 59-60
*Rent-A-Center, Inc. v. Commissioner*,
142 T.C. 1 (2014) ................................................................... 54
*Reserve Mechanical Corp. v. Commissioner*,
T.C. Memo. 2018-86, *aff'd*,
34 F.4th 881 (10th Cir. 2022) ........................................... 10, 13, 65
*Royalty Mgmt. Insur. Co., Ltd. v. Commissioner*,
T.C. Memo. 2024-87 ............................................................ 39, 50
*Ryan, LLC v. Internal Revenue Serv.*,
2025 WL 3089415 (N.D. Tex. Nov. 5, 2025) .......................... 46, 73
*Ryan, LLC v. Internal Revenue Serv.*, 2026 WL 1847197
(N.D. Tex. June 26, 2026), *appeal docketed*,
No. 26-10708 (5th Cir.) ................................i, 22, 31, 35, 39-40, 46
51-52, 55, 59, 62, 66-68, 83
*S.E.C. v. Chenery Corp.*,
318 U.S. 80 (1943) ........................................................... 33-35, 56
*Sacora v. Thomas*,
628 F.3d 1059 (9th Cir. 2010) ............................................... 68-69
*Standard Insurs. v. Internal Revenue Serv.*,
162 F.4th 1035 (10th Cir. 2025) ................................................... 12
*State of Nebraska Dep't of Health & Human Servs. v.*
*Dep't of Health & Human Servs.*,
435 F.3d 326 (D.C. Cir. 2006) ....................................................... 79

**Cases (cont'd):** **Page(s)**

*Stearns-Roger Corp. v. United States*,
774 F.2d 414 (10th Cir. 1985) .................................................... 41
*Swift v. Commissioner*,
T.C. Memo. 2024-13, *aff'd*, 144 F.4th 756
(5th Cir. 2025)............................................... 13, 30, 39, 50, 65, 67
*Syzygy v. Commissioner*,
T.C. Memo. 2019-34.............................................................. 39, 49
*Texas Med. Ass'n v. U.S. Dep't of Health and Human Servs.*, 120 F.4th 494 (5th Cir. 2024), *reh'g en banc granted, panel op. vacated per curiam*, 138 F.4th 961
(5th Cir. 2025)........................................................................... 81
*Texas Med. Ass'n v. U.S. Dep't of Health and Human Servs.*, 188 F.4th 359 (5th Cir. 2026)............................................. 79
*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022).................................................. 24, 70
*TMJ Implants, Inc. v. U.S. Dep't of Health & Human Servs.*, 584 F.3d 1290 (10th Cir. 2009) ......................................... 42
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .............................................................. 80, 83
*Turnham v. Commissioner*,
979 F.3d 1322 (11th Cir. 2020) ..................................................... 8
*U.S. Dep't of Health and Human Servs. v. Texas Med. Ass'n*, No. 26-491 (S. Ct.)............................................................. 79
*U.S. Sportsmens' Alliance Found. v. Ctrs. for Disease Control and Prevention*, 167 F.4th 813 (6th Cir. 2026) ..........42-43
*United States v. Bisceglia*,
420 U.S. 141 (1975) ............................................................... 6, 32
*United States v. Kanchanalak*,
192 F.3d 1037 (D.C. Cir. 1999) ................................................... 42
*United States v. Rochelle*,
384 F.2d 748 (5th Cir. 1967) ........................................................ 67
*United States v. Texas*,
599 U.S. 670 (2023) ........................................................... 79, 83-84
*Ward v. Merit Sys. Prot. Bd.*,
981 F.2d 521 (Fed. Cir. 1992)....................................................... 33

**Cases (cont'd):** **Page(s)**

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......... 81
*Williamson v. Lee Optical of Okla., Inc.*,
348 U.S. 483 (1955) .......... 45

**Statutes:**

5 U.S.C.:

§551 .......... 5
§702(1) .......... 81
§704 .......... 24
§706 .......... 25
§706(2)(A) .......... 24
§706(2)(E) .......... 25

Internal Revenue Code (26 U.S.C.):

§162 .......... 9
§831(b) .......... 5, 12, 14, 16, 37, 43-49, 67, 72
§831(b)(1)-(2) .......... 12
§831(b)(2)(B) .......... 46
§831(b)(2)(B)(i)(I) .......... 44
§831(b)(2)(B)(i)(II) .......... 44
§831(b)(2)(B)(ii) .......... 44
§831(b)(2)(B)(iii) .......... 44
§6011 .......... 7-8, 32, 75
§6011(a) .......... 7, 32
§6103(a) .......... 68
§6501(c)(10) .......... 8
§6707(a) .......... 7
§6707A .......... 8, 32
§6707A(b)(2) .......... 8
§6707A(c) .......... 7
§6707A(c)(1) .......... 7, 18, 26-31, 34-36, 42
§6707A(c)(2) .......... 7-8, 19, 71, 75-76

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§7213 .......... 68
§7213A .......... 68
§7431 .......... 68

28 U.S.C.:

§1291 .......... 1
§1331 .......... 1

Revenue Act of 1914, P.L. 63-217, 38 Stat. 745 .......... 11

**Regulations:**

Treasury Regulations (26 C.F.R.):

§ 1.6011-4 .......... 7-8, 32
§ 1.6011-4(a) .......... 7-8
§ 1.6011-4(b)(1) .......... 7
§ 1.6011-4(b)(1)-(2) .......... 7-8
§ 1.6011-4(b)(2) .......... 71
§ 1.6011-10 .......... 1-2, 4-5, 16, 19-20, 71, 73-74, 78, 81, 83
§ 1.6011-10(b)(1) .......... 16-17, 36-38, 71
§ 1.6011-10(b)(1)(i) .......... 5
§ 1.6011-10(b)(1)(iii) .......... 37
§ 1.6011-10(b)(2)(i) .......... 17
§ 1.6011-10(b)(2)(ii) .......... 17
§ 1.6011-10(c) .......... 17
§ 1.6011-10(c)(1) & (2) .......... 17, 71
§ 1.6011-11 .......... 1-3, 5, 16, 20, 24, 26, 35, 47, 62, 69
§ 1.6011-11(b)(1) .......... 5, 16, 36-38
§ 1.6011-11(b)(2)(i) .......... 17
§ 1.6011-11(c)(1) & (2) .......... 16, 36
§ 1.6011-11(c)(2) .......... 16, 50
§ 301.6111-3 .......... 7

**Miscellaneous:**

*Black's Law Dictionary* (12th ed. 2024) .......... 9

Elaine Church & Corina Trainer, *Reportable Transactions: A Comprehensive Disclosure Regime to Combat Tax Shelters*, 57 Major Tax Planning (2005) .......... 27

Fed. R. App. P.:

Rule 4(a)(1)(B) .......... 1
Rule 54(b) .......... 2

H.R. Rep. No. 69-1 (1925) .......... 11

H.R. Rep. No. 99-426 (1985) .......... 12

H.R. Rep. 108-548, pt. 1 (2004) .......... 7

https://www.irs.gov/statistics/irs-the-tax-gap (updated Apr. 14, 2026) .......... 6

https://www.merriam-webster.com/dictionary/avoid .......... 28

https://www.merriam-webster.com/dictionary/determine .......... 28

https://www.merriam-webster.com/dictionary/identify .......... 75

https://www.merriam-webster.com/dictionary/potential .......... 29-30

https://www.merriam-webster.com/dictionary/type .......... 27

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21,547-01 (2023) .......... 15-16, 38, 50-51, 73

**Miscellaneous (cont'd):** **Page(s)**

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3,534-01 (2025)..................... 11-12, 15-17, 34-35, 38-41, 49, 50-51, 54-61, 63-66, 68-69, 72-73, 77-78

*Micro-Captive Transactions*, Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016)........................................14

OXFORD ENGLISH DICTIONARY (2d ed. 1989) ............................29-31

S. Rep. No. 114-16 (2015) ..............................................................46

## GLOSSARY

| Abbreviation | Definition |
|---|---|
| Br. | Plaintiffs' opening brief on appeal |
| the Government | Internal Revenue Service, Commissioner of Internal Revenue, Department of the Treasury, and Scott Bessent, in his official capacity as Secretary of the Treasury |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| NAIC | National Association of Insurance Commissioners |
| Notice 2016-66 | *Transactions of Interest—Section 831(b) Micro-Captive Transactions*, Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016) |
| PATH Act | Protecting Americans from Tax Hikes Act of 2015, P.L. 114-113, 129 Stat. 2242, Div. Q |
| Plaintiffs | Drake Plastics Limited Company, Drake Insurance Company, and Strategic Risk Alternatives, L.L.C., doing business as SRA 831(b) Admin |
| Treas. Reg. | Treasury Regulation (26 C.F.R.) |
| Treasury | Department of the Treasury and the IRS |

## STATEMENT OF JURISDICTION

1. Plaintiffs Drake Plastics Limited Company, Drake Insurance Company, and Strategic Risk Alternatives, L.L.C. (collectively, "plaintiffs") brought this suit against the Government in the District Court, seeking an order invalidating Treasury Regulations ("Treas. Reg.") (26 C.F.R.) §§1.6011-10 and 1.6011-11. (ROA.12-68.) The court had subject matter jurisdiction under 28 U.S.C. §1331.

On April 15, 2026, the District Court issued a "Memorandum and Opinion" and entered a "Final Judgment" that (i) upheld Treas. Reg. §1.6011-11, but (ii) declared Treas. Reg. §1.6011-10 unlawful, vacated it, and remanded it to the Department of the Treasury and IRS (collectively, "Treasury"). (ROA.24878-24932.) The judgment was final, resolving all claims of all parties.

Plaintiffs and the Government filed timely notices of appeal and cross-appeal on April 30, 2026, and June 11, 2026, respectively. Fed. R. App. P. 4(a)(1)(B); (ROA.24941-24944, ROA.24981-24982.) This Court has jurisdiction under 28 U.S.C. §1291.

2. In general, an order remanding a matter to an administrative agency is not final and appealable. *Adkins v. Silverman*,

899 F.3d 395, 400 (5th Cir. 2018). However, there are two reasons that the general rule does not apply to the portion of the District Court's April 15, 2026 Final Judgment remanding Treas. Reg. §1.6011-10 to Treasury. First, a remand order is final and appealable when it "effectively terminates the … action." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 515 (D.C. Cir. 2020). Here, the court denominated its judgment as final, it did not retain jurisdiction over the remand, and no further court proceedings were contemplated. Second, an agency can appeal a remand order when, if it were to comply with that order, it "would be unable to later appeal the issue that is the subject of the remand order." *Adkins*, 899 F.3d at 401. Here, Treasury would be unable to appeal the remand order if it were to conduct a new rulemaking consistent therewith.

The finality of the District Court's April 15, 2026 Final Judgment is not altered by the court's subsequent entry of "Partial Final Judgment Under Rule 54(b)." (ROA.24975.) After plaintiffs appealed from the April 15, 2026 Final Judgment, they moved for entry of judgment under Fed. R. Civ. P. 54(b) concerning the portion of the judgment upholding Treas. Reg. §1.6011-11. (ROA.24949-24972.) That

motion was intended as "a belt-and-suspenders approach" to eliminate any potential ambiguity about this Court's jurisdiction. (ROA.24957, ROA.24963.) But the parties and the District Court always recognized that the April 15, 2026 Final Judgment "finally resolved all the claims in this case" and was immediately appealable in full. (ROA.24975; *see* ROA.24950, ROA.24961-24962.)

## STATEMENT OF THE ISSUES

Under the disclosure regime established by Congress, taxpayers and material advisors must file reports with the IRS affirmatively disclosing their involvement in "reportable transactions." Relevant here are two categories of reportable transactions: "transactions of interest," which are transactions that Treasury has determined have a potential for tax avoidance or evasion, and "listed transactions," which are transactions that Treasury has specifically identified as tax-avoidance transactions. The issues presented are:

I. Plaintiffs' appeal:

Whether the District Court correctly held that Treasury engaged in reasoned decisionmaking when it promulgated Treas. Reg. §1.6011-

11, which identified certain micro-captive insurance arrangements as transactions of interest.

II. The Government's cross-appeal:

1. Whether the District Court erred in holding that Treasury exceeded its authority when it promulgated Treas. Reg. §1.6011-10, which identified certain other micro-captive insurance arrangements as listed transactions.

2. If the District Court did not err in holding that Treasury exceeded its authority when it promulgated Treas. Reg. §1.6011-10, whether the court abused its discretion in vacating the regulation nationwide.

## STATEMENT OF THE CASE

### A. The nature of the case and course of proceedings in the District Court

Plaintiffs include a manufacturing company, its purported micro-captive insurer, and a limited liability company that creates and manages micro-captive insurance arrangements. (ROA.19, ROA.21-22.) In 2025, Treasury promulgated regulations identifying two categories of micro-captive insurance arrangements as "transactions of interest" and "listed transactions," respectively, meaning that plaintiffs were required

to affirmatively disclose their involvement in such arrangements to the IRS.[1] Treas. Reg. §§1.6011-10, 1.6011-11.

Plaintiffs brought the instant suit under the Administrative Procedure Act, 5 U.S.C. §551, *et seq.*, seeking to set aside the regulations as arbitrary, capricious, and/or exceeding statutory authority. (ROA.12-68.) The District Court issued a memorandum opinion, holding that (i) Treasury acted within its authority and engaged in reasoned decisionmaking when it promulgated the transaction-of-interest regulation, but (ii) exceeded its authority when it promulgated the listed-transaction regulation. (ROA.24878-24931.) Accordingly, the court granted summary judgment to the Government as to the transaction-of-interest regulation, granted summary judgment to plaintiffs as to the listed-transaction regulation, and vacated the listed-transaction regulation nationwide. (ROA.24931-24932.)

---

[1] The captive insurer has since revoked its election under I.R.C. §831(b) to exclude its premiums from income. (ROA.21.) Consequently, only the limited liability company has a current reporting obligation. *See* Treas. Reg. §§1.6011-10(b)(1)(i), 6011-11(b)(1).

### B. The relevant facts

#### 1. Introduction

Treasury, the courts, and practitioners agree that micro-captive insurance arrangements can be used for tax avoidance or evasion, which makes them appropriate candidates for identification as reportable transactions. *Infra*, pp. 10-13. However, plaintiffs disagree with the criteria that Treasury used when it promulgated regulations that identify certain micro-captive insurance arrangements. Below, we explain the reportable transaction regime, the potential for taxpayers to abuse micro-captive insurance arrangements, and Treasury's decision to identify certain micro-captive insurance arrangements as reportable transactions.

#### 2. The reportable transaction regime

Our federal tax system "is based on a system of self-reporting." *United States v. Bisceglia*, 420 U.S. 141, 145 (1975). However, "it would be naive to ignore the reality that some persons attempt to outwit the system, and tax evaders are not readily identifiable." *Id.* In the aggregate, billions of dollars go uncollected annually, commonly referred to as the "tax gap." https://www.irs.gov/statistics/irs-the-tax-gap (updated Apr. 14, 2026) (estimating the tax gap for the 2022 tax

year at $696 billion). To combat the well-known "audit lottery," help close the tax gap, and best utilize the IRS's limited enforcement resources, Congress has enacted legislation requiring that taxpayers affirmatively disclose their involvement in certain tax-avoidance and potential tax-avoidance transactions. I.R.C. §§6011, 6707A(a), (c)(1)-(2). The purpose of this legislation is self-evident: "the best way [for the IRS] to combat tax shelters is to be aware of them." H.R. Rep. 108-548, pt. 1, at 261 (2004); *accord CIC Servs., LLC v. Internal Revenue Serv.*, 593 U.S. 209, 213-14 (2021).

Under I.R.C. §6011 and Treas. Reg. §1.6011-4, taxpayers must file forms with the IRS affirmatively disclosing involvement in "reportable transactions." I.R.C. §§6011(a), 6707A(c); Treas. Reg. §1.6011-4(a); *see* I.R.C. §§6111(a), 6707(a) (extending these requirements to material advisors); Treas. Reg. §301.6111-3 (same). Included in the definition of reportable transactions are "transactions of interest" and "listed transactions." I.R.C. §6707A(c); Treas. Reg. §1.6011-4(b)(1)-(2), (6). Transactions of interest are transactions that the Secretary of the Treasury has determined have "a potential for tax avoidance or evasion." I.R.C. §6707A(c)(1); Treas. Reg. §1.6011-4(b)(1), (6). Listed

transactions are transactions that the Secretary has "specifically identified … as a tax avoidance transaction." I.R.C. §6707A(c)(2); Treas. Reg. §1.6011-4(b)(1)-(2). The disclosure requirements under I.R.C. §6011 and Treas. Reg. §1.6011-4 are backed by civil penalties, which are codified at I.R.C. §6707A.

The criteria for identifying an arrangement as a listed transaction are generally more stringent than the criteria for other reportable transactions, such as transactions of interest; therefore, failure to report a listed transaction carries the potential for a higher maximum penalty. I.R.C. §6707A(b)(2); *see also* I.R.C. §6501(c)(10). Nonetheless, the fact that an arrangement is a reportable transaction, including a listed transaction, "shall not affect the legal determination of whether the taxpayer's treatment of the transaction is proper." Treas. Reg. §1.6011-4(a)*; accord Turnham v. Commissioner*, 979 F.3d 1322, 1326 (11th Cir. 2020). In other words, a listed transaction is one that Treasury considers an impermissible tax-avoidance transaction, but taxpayers remain free to challenge that view when it comes to determining their liability.

### 3. Small captive insurance arrangements and the potential for abuse

a. Insurance generally involves an insurer entering into a contract with a third party, wherein the insurer agrees to compensate that party (the insured) if it experiences a loss from a specified risk. *Black's Law Dictionary* (12th ed. 2024). In exchange for such coverage, the insured pays the insurer an agreed-upon premium. *Id.*

Conventional insurance arrangements occur through the commercial marketplace, where the insurer and insured are unrelated parties negotiating at arm's length, and the insured has no interest in, or control over, the premiums after remitting them to the insurer. Accordingly, although the insured may claim a deduction under I.R.C. §162 for premiums paid, the insured has no incentive—tax or otherwise—to purchase unnecessary insurance or pay premiums in excess of fair market value. "From the standpoint of the insured there can be no profit from" the risk covered by the insurance. *AMERCO, Inc. v. Commissioner*, 979 F.2d 162, 167 (9th Cir. 1992). That is, even if the event insured against never occurs (or occurs and the resulting loss is fully covered), the insured will still be poorer by the amount of premiums paid.

b. The incentives change, however, in so-called "captive" insurance arrangements where the insurer and its insured(s) are affiliated. *Reserve Mechanical Corp. v. Commissioner*, T.C. Memo. 2018-86, *aff'd*, 34 F.4th 881, 885 (10th Cir. 2022) (citing *CIC Servs.*, 593 U.S. at 213). As the president and owner of one captive insurance manager acknowledged, "captive insurance arrangements can 'most definitely' be used for tax avoidance or evasion purposes." *CIC Servs., LLC v. Internal Revenue Serv.*, 2017 WL 6016526, at *2 (E.D. Tenn. Apr. 21, 2017).

Such avoidance or evasion can occur where one or more affiliated insureds pay (often excessive) amounts as insurance premiums to a captive insurer for contracts that the parties label as insurance contracts, but the manner in which the contracts are interpreted, administered, and applied is inconsistent with arm's-length transactions and sound business practices. Such contracts also may provide coverage that the insureds do not really need. On the insureds' side, this generates large deductions that decrease their current taxable income. Because the insureds and the insurer are under common control, the insureds (or their owners) never really lose control of the

funds. Although the insurer may nominally provide insurance to unrelated parties, tax-avoidance captive arrangements are structured so that there is little or no risk that the insurer will have to pay any significant loss suffered by such parties. *CIC Servs.,* 593 U.S. at 213-24.

c. The risk of tax avoidance or evasion is magnified in arrangements involving a small captive insurer, often referred to as a "micro-captive." For over a century, Congress has provided special tax treatment to small and mutual insurers, which were "traditionally held by their members in a given geographic location 'solely for the protection of their own property and not for profit.'" *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3,534-01, 3,555 (2025) (quoting Revenue Act of 1914, P.L. 63-217, 38 Stat. 745, 762). "These small insurers, including groups of farmers and fire associations, were exempt from ordinary income tax laws and were understood to collect funds only up to what was needed for losses and expenses." *Id.* (citing H.R. Rep. No. 69-1, at 9 (1925)).

In 1986, Congress enacted I.R.C. §831(b) with the goal of simplifying the law applicable to small and mutual insurers.[2] 90 Fed. Reg. at 3,539 (citing H.R. Rep. No. 99-426, at 678 (1985)). As amended in 2015, §831(b) provides that small insurers (other than life insurance companies) can exclude up to $2.2 million of premium income (adjusted for inflation) from their taxable income. I.R.C. §831(b)(1)-(2). Thus, in captive arrangements involving small insurers, the potential tax benefit is twofold: (i) on the insureds' side, the payment of premiums generates deductions that reduce taxable income and (ii) on the insurers' side, the premiums received are excluded from taxable income. *Standard Insurs. v. Internal Revenue Serv.*, 162 F.4th 1035, 1039 (10th Cir. 2025). "The result is that the money does not get taxed at all." *CIC Servs.*, 593 U.S. at 213.

Of course, the decision not to tax the premium income of small insurance companies, "for better or worse, is a congressional choice." *CIC Servs.,* 593 U.S. at 213. But "these tax benefits should only accrue

[2] Plaintiffs assert that Congress enacted I.R.C. §831(b) so that more small businesses could take advantage of captive insurance arrangements. (Br. 3.) However, nothing in the text, structure, or legislative history of §831(b) suggests it was enacted with captive insurance arrangements in mind. 90 Fed. Reg. at 3,539; (ROA.24900).

if the money is 'really for insurance.'" *Swift v. Commissioner*, T.C. Memo. 2024-13, *aff'd*, 144 F.4th 756, 761 (5th Cir. 2025) (quoting *CIC Servs.*, 593 U.S. at 213). The IRS and courts have determined that many micro-captive insurance arrangements are not, in fact, insurance for federal tax purposes and therefore not entitled to the tax benefits that inure thereto. *E.g.*, *Swift*, 144 F.4th at 768-69; *Reserve Mechanical*, 34 F.4th at 915-17; *Patel v. Commissioner*, 165 T.C. 171, 200 (2025), *appeals docketed*, Nos. 26-60180, 26-60181, & 26-60194 (5th Cir.); *Avrahami v. Commissioner*, 149 T.C. 144, 197-99 (2017).

Courts generally evaluate whether an arrangement constitutes insurance for federal tax purposes based on whether it: (1) involves insurable risks, (2) shifts the risk of loss to the insurer, (3) distributes the risk among policyholders, and (4) constitutes insurance in the commonly accepted sense. *E.g.*, *Swift*, 144 F.4th at 765 (citing *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941)); *Reserve Mechanical*, 34 F.4th at 904. In some cases, courts have also applied traditional anti-abuse doctrines, like the sham-transaction and economic-substance doctrines. *E.g.*, *Malone & Hyde, Inc. v. Commissioner*, 62 F.3d 835, 840-41 (6th Cir. 1995); *Patel*, 165 T.C. at 194-98. Regardless of framing,

courts look beyond the formalities and consider the character of the business actually done. *Avrahami*, 149 T.C. at 192 (citing *Malone & Hyde*, 62 F.3d at 842-43); *see also Bowers v. Lawyers' Mort. Co.*, 285 U.S. 182, 188 (1932).

#### 4. Treasury identifies certain micro-captive insurance arrangements as reportable transactions subject to an affirmative disclosure requirement

Against this backdrop, Treasury issued *Transactions of Interest—Section 831(b) Micro-Captive Transactions*, Notice 2016-66, 2016-47 I.R.B. 745 (Nov. 21, 2016) ("Notice 2016-66"), which identified certain micro-captive insurance arrangements as transactions of interest that need to be affirmatively reported to the IRS. The goal of this designation, like any other reportable transaction designation, was to arm the IRS with information about covered arrangements so "the IRS can check for facts … suggesting that the taxpayer is not entitled to the tax benefit it claims." *CIC Servs.*, 593 U.S. at 213-14. However, a court vacated Notice 2016-66 because it determined that the Notice should have been promulgated via notice-and-comment rulemaking and was not supported by the administrative record submitted in connection therewith. *CIC Servs., LLC v. Internal Revenue Serv. ("CIC Services I")*,

592 F. Supp. 3d 677, 683-88 (E.D. Tenn. Mar. 21, 2022), *as modified by* 2022 WL 2078036 (E.D. Tenn. June 2, 2022); *see Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142-48 (6th Cir. 2022) (reportable transactions must be identified by regulation). Treasury therefore obsoleted Notice 2016-66. *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21,547-01, 21,553 (2023).

Treasury also proposed a new reporting requirement for micro-captive insurance arrangements that would address the infirmities identified in *CIC Services I*, *supra*. 88 Fed. Reg. at 21,547. In doing so, Treasury reviewed caselaw evaluating what constitutes insurance, current examination materials pertaining to taxpayers claiming tax benefits that inure to insurance companies, industry data, expert reports, and stakeholder comments. 90 Fed. Reg. at 3,542-43, 3,538; 88 Fed. Reg. at 21,552-53, 21,557; (ROA.497-498.) All told, Treasury compiled a 24,000-page administrative record. (ROA.489-498.)

The final regulations that emerged from the rulemaking process established two categories of reportable transaction: (i) transactions of interest, which Treasury determined have a potential for tax avoidance

or evasion, and (ii) listed transactions, which Treasury specifically identified as tax-avoidance transactions. Treas. Reg. §§1.6011-10, 1.6011-11. An arrangement falls within the transaction-of-interest category if it satisfies (i) the relationship test and (ii) either a modified loss-ratio factor or a related-party financing factor. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1), (c)(1) & (2). The relationship test is satisfied if the arrangement involves a small, closely held captive insurer that made an election under I.R.C. §831(b), which creates an opportunity to engage in tax avoidance or evasion. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1); 90 Fed. Reg. at 3,539, 3,550-52; 88 Fed. Reg. at 21,552. The loss-ratio factor is satisfied if, over a period of 10 years (or the entirety of the captive's existence, if it has existed for under 10 years), the captive produced a loss-ratio of less than 60%,[3] which was below the industry average and therefore a strong indicator that the captive was charging excessive premiums. Treas. Reg. §1.6011-11(c)(2); 90 Fed. Reg. at 3,540-41, 3,546. The financing factor is

[3] As discussed at p. 50 & n.6, *infra*, the regulations calculate an insurer's loss ratio as the sum of the amounts paid out in claims and claim administration expenses, divided by the difference between premiums earned and policyholder dividends paid.

satisfied if, within the last five years, the captive has agreed to loan premium payments back to its commonly owned insureds or other affiliates, a circumstance indicating a circular flow of funds. Treas. Reg. §§1.6011-10(b)(2)(i), 1.6011-11(b)(2)(i) & (c)(1); 90 Fed. Reg. at 3,546.

An arrangement falls within the listed-transaction category only if it satisfies a more stringent test. Like the transaction-of-interest category, the listed-transaction category includes the relationship test, modified loss-ratio factor, and related-party financing factor. Treas. Reg. §1.6011-10(b)(1), (c)(1) & (2). However, instead of having to satisfy either the loss-ratio factor or the financing factor, an arrangement qualifies as a listed transaction only if it satisfies both. *Id.* §1.6011-10(c). Furthermore, the loss ratio is significantly reduced, from 60% to 30%, and can only be satisfied if the captive has been in existence for at least 10 years and maintained a loss ratio below 30% for the most recent 10 years. *Id.* §1.6011-10(b)(2)(ii), (c)(2).

### C. Proceedings in the District Court

Plaintiffs filed suit in the District Court, seeking to vacate both the transaction-of-interest and listed-transaction regulations. (ROA.12-

68.) The court upheld the former, but not the latter. (ROA.24878-24931.)

1. As to the transaction-of-interest regulation, the District Court began by discussing the "capacious" reach of I.R.C. §6707A(c)(1), which gives Treasury "wide discretion to require taxpayers to report transactions that are of a type … with a potential for tax abuse." (ROA.24896-24897, ROA.24926.) The court concluded that the reporting requirement contemplated under this provision must, "by its nature, … be overinclusive" to enable finding "the tax-evader needles in the taxpayer haystack." (ROA.24898-24899.) The court further concluded that a transaction-of-interest designation was well suited to addressing micro-captive insurance arrangements because, "[a]lthough some micro-captives are legitimate insurers … the potential for tax avoidance or evasion is apparent." (ROA.24879.)

Over plaintiffs' objection, the court held that the transaction-of-interest regulation was "reasonable and reasonably explained." (ROA.24914-24915, ROA.24918, ROA.24927.) In particular, the court held that the relationship test, loss-ratio factor, and financing factor combined to capture transactions "of a type that may not really be for

insurance" and for which "the potential for tax avoidance is patent." (ROA.24904.) The court acknowledged plaintiffs' disagreement with Treasury's decision to use those criteria, but concluded that their "policy disagreement" did not render the decision arbitrary and capricious. (ROA.24920, ROA.24926.)

2. As to the listed-transaction regulation, the District Court observed that I.R.C. §6707A(c)(2) imposes a stricter standard than (c)(1). (ROA.24897-24899.) In the court's view, this meant that Treasury must determine that an arrangement is "presumptively tax avoidant," rather than potentially tax avoidant as with transactions of interest. (ROA.24899.) Furthermore, the court construed this standard as only being satisfied if Treasury determined that the transaction was illegitimate "more than half the time." (*Id.*) The court concluded that, in designating a new category of listed transaction, Treasury had appropriately "focuse[d] on transactions that bore the typical features of tax-avoidance … and were abnormal." (ROA.24912.) But the court held that, where Treasury had failed to examine all the arrangements covered by Treas. Reg. §1.6011-10 and determine that at least 51% were not entitled to the tax benefit claimed, it exceeded its authority. (*Id.*)

3. Finally, the District Court determined that the appropriate remedy was to vacate the listed-transaction regulation nationwide. (ROA.24929-24931.) In doing so, the court considered and rejected the Government's request that the regulation be remanded to Treasury without vacating it. (ROA.24929-24930.) We do not challenge that exercise of the court's discretion. We do, however, challenge the court's failure to address the Government's other requests to more narrowly tailor the vacatur remedy, such as vacating the regulation only as to the plaintiffs. (ROA.24927-24931.)

## SUMMARY OF ARGUMENT

Congress has authorized Treasury to designate arrangements that it has determined have a potential for tax avoidance or evasion as "reportable transactions," of which "transactions of interest" are a subcategory, and to designate arrangements that it has specifically identified as tax-avoidance transactions as "listed transactions." Treasury exercised that authority when it promulgated Treas. Reg. §§1.6011-10 and 1.6011-11, which designated certain micro-captive insurance arrangements as "transactions of interest" and "listed transactions." Taxpayers remain free to participate in such

arrangements and maintain their legitimacy. But they must affirmatively disclose their participation so that the IRS can determine whether to conduct examinations and, if appropriate, disallow the tax benefits claimed.

Plaintiffs argue that the micro-captive reporting requirements were arbitrary, capricious, and/or in excess of Treasury's authority. The District Court correctly rejected that argument as to the transaction-of-interest regulation, which it held was the product of reasoned decisionmaking. However, the court erroneously held that Treasury exceeded its authority when it promulgated the listed-transaction regulation.

1. The administrative record demonstrates that each of the three criteria used by Treasury to identify transactions of interest was reasonably designed to capture arrangements with a potential for tax avoidance or evasion. First, the relationship test limits the rule to small, closely held captives, as the risk of a tax-avoidant transaction is greater where the relevant parties are under common control. Second, the loss-ratio factor focuses on arrangements in which a below-average loss ratio indicates that premiums are consistently being priced in a

way that does not reflect arm's-length dealing or, relatedly, that the captive is merely a savings vehicle for its policyholders. Third, the related-party financing factor focuses on arrangements in which the captive insurer loans premium payments back to the insured that paid them, creating a circular flow of funds. Two other district courts have joined the District Court here in holding that the transaction-of-interest rule is reasonable and reasonably explained, confirming that the holding is sound. *Ryan, LLC v. Internal Revenue Serv.*, 2026 WL 1847197, at *9-16 (N.D. Tex. June 26, 2026), *appeal docketed*, No. 26-10708 (5th Cir.); *CIC Servs., LLC v. Internal Revenue Serv.*, 2026 WL 622836, at *3-9 (E.D. Tenn. Mar. 5, 2026), *appeal docketed*, No. 26-5210 (6th Cir.).

2. The administrative record similarly demonstrates that Treasury acted reasonably in using more stringent criteria to specifically identify micro-captive listed transactions as tax-avoidance transactions. Unlike the transaction-of-interest rule, which kicks in if two of the three criteria are satisfied, the listed-transaction rule only kicks in if all three are satisfied. Just as importantly, the loss-ratio factor was reduced to 30%, substantially below the 60% loss ratio used

in the transaction-of-interest rule (which was itself below the industry average). Even then, the loss ratio must stay below 30% for at least 10 years—enough to demonstrate that premiums are consistently and repeatedly priced in a way that is inconsistent with arm's-length dealing and/or reflects that the arrangement is merely a savings vehicle.

The District Court nonetheless held that Treasury exceeded its authority in promulgating the listed-transaction regulation. In reaching this holding, however, the court created a standard under which Treasury must identify and examine the full universe of tax-avoidance transactions before imposing a reporting requirement. In imposing a standard that was neither dictated by the statutory scheme nor workable in practice, the court erred.

The District Court compounded its error by vacating the listed-transaction regulation nationwide, rather than crafting a remedy that was more narrowly tailored. By so doing, the District Court perpetuated many of the problems engendered by nationwide injunctions, including effectively claiming veto power over an out-of-circuit district court's earlier ruling upholding the regulation and

forestalling consideration of the regulation's validity by another district court within this Circuit.

## ARGUMENT

### Standard of review

This Court reviews *de novo* the grant and denial of cross-motions for summary judgment. *Bell v. Itawamba Cty. School Bd.*, 799 F.3d 379, 389 (5th Cir. 2015). This Court reviews for abuse of discretion the District Court's decision to vacate agency action. *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

### I

### This Court should affirm the District Court's judgment upholding Treas. Reg. §1.6011-11

#### A. Introduction: the Administrative Procedure Act

The Administrative Procedure Act ("APA") provides for judicial review of final agency action for which there is no other adequate remedy at law. 5 U.S.C. §704. In reviewing agency action, courts apply an "arbitrary and capricious" standard. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); 5 U.S.C. §706(2)(A). Under this standard, courts "may not set aside an agency rule that is rational, based on consideration of the relevant factors and

within the scope of the authority delegated to the agency." *State Farm*, 463 U.S. at 42-43; *see Barr v. S.E.C.*, 114 F.4th 441, 447 (5th Cir. 2024) ("Agency decisions are presumptively valid; the petitioner bears the burden of showing otherwise."). So framed, "[t]he scope of review … is narrow, and a court is not to substitute its judgment for that of the agency."[4] *Hasie v. Office of Comptroller of Currency*, 633 F.3d 361, 365 (5th Cir. 2011); *see Barr*, 114 F.4th at 446.

Ultimately, courts should sustain agency action if they determine that the agency acted "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council*, 462 U.S. 87, 105 (1983). In other words, the "agency action [must] be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This determination is made by reviewing the agency's action in light of "the whole [administrative] record or those parts of it cited by a party." 5 U.S.C. §706. Even if the agency explains its decision "with less than ideal clarity," the decision will nonetheless be sustained if the record

---

[4] The APA also contains a "substantial evidence" standard. 5 U.S.C. §706(2)(E). However, plaintiffs did not raise this standard below (ROA.2904 n.4), and it is not properly before this Court.

allows "the agency's path [to] reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004).

### B. The District Court correctly held that Treasury engaged in reasoned decisionmaking when it identified certain micro-captive insurance arrangements as transactions of interest

The District Court held that the transaction-of-interest rule passed muster. In doing so, the court joined two other district courts that have likewise held that the rule was reasonable and reasonably explained. This Court should affirm the considered judgment of these three courts and hold that Treasury engaged in reasoned decisionmaking in promulgating Treas. Reg. §1.6011-11.

#### 1. The standard to identify a new transaction-of-interest category

a. We begin, as the District Court did, by considering the standard for Treasury to designate an arrangement as a reportable transaction, of which transactions of interest are a subcategory. Congress defined a "reportable transaction" as a transaction "of a type which the Secretary [of Treasury] determines as having a potential for tax avoidance or evasion." I.R.C. §6707A(c)(1). In so authorizing

Treasury to designate reportable transactions, Congress made four things clear.

First, by using the phrase "of a type," Congress intended that Treasury would take a categorical approach to designating reportable transactions, rather than an amorphous fact-and-circumstances approach. *See* I.R.C. §6707A(c)(1). This is consistent with the ordinary meaning of the word "type," namely "one having qualities of a higher category." https://www.merriam-webster.com/dictionary/type; *see Commissioner v. Soliman*, 506 U.S. 168, 174 (1993) (undefined terms in tax statutes should be afforded their ordinary meaning). As the Eleventh Circuit observed, a reportable-transaction designation "is intended to provide taxpayers with a 'bright line' and 'clear and objective' definition" of the arrangements that must be disclosed. *Green Rock LLC v. Internal Revenue Serv.*, 104 F.4th 220, 223 (11th Cir. 2024) (quoting Elaine Church & Corina Trainer, *Reportable Transactions: A Comprehensive Disclosure Regime to Combat Tax Shelters*, 57 Major Tax Planning 12-1, 12-8 (2005)).

Second, by using the phrase "which the Secretary [of the Treasury] determines," Congress intended to give Treasury discretion in

choosing where to draw those lines and how to craft those definitions. *See* I.R.C. §6707A(c)(1). After all, "determine" means "to settle or decide by choice of alternatives or possibilities." https://www.merriam-webster.com/dictionary/determine.

Third, by authorizing Treasury to identify transactions having a potential for "tax avoidance or evasion"—rather than abusive transactions, sham transactions, or the like—Congress intended that Treasury's discretion would be broad. *See* I.R.C. §6707A(c)(1). The word avoidance, in particular, is expansive, meaning simply "to keep away from." https://www.merriam-webster.com/dictionary/avoid. In the context of §6707A(c)(1), this means transactions having a potential to "keep [taxpayers] away from" tax for which they would otherwise be liable.

Fourth, by authorizing Treasury to identify transactions having "a potential" for tax avoidance or evasion, Congress intended that Treasury could designate arrangements as reportable transactions even if they may not result in actual tax avoidance or evasion. *See* I.R.C. §6707A(c)(1). This follows from the meaning of the word "potential," namely "something that can develop or become actual."

https://www.merriam-webster.com/dictionary/potential; *see id.* (defining "potential" as "existing in possibility: capable of development into actuality" and "expressing possibility"); *Potential*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining "potential" as "possible as opposed to actual" and "that which is possible, opposed to what is actual").

In light of the foregoing, the District Court came to the unremarkable conclusion that I.R.C. §6707A(c)(1) authorizes Treasury to designate a class of transactions as "reportable" even if it encompasses one or more individual transactions that are not tax avoidant. (ROA.24896-24897.) Similarly, the court concluded that an arrangement has "potential for tax avoidance or evasion" if it "may allow an individual or entity to avoid paying taxes when they should have." (ROA.24896.) And because Congress did not require that reportable transactions be "probable, more likely than not, or even plausible" tax-avoidance or tax-evasion transactions, the court declined to engraft such a requirement onto §6707A(c)(1). (*Id.*)

b. Plaintiffs urge this Court to adopt a more restrictive standard for "reportable transactions," namely arrangements with "defining features" that are "consistently associated with abuse" and

"create a genuine capacity for abuse." (Br. 64.) The problem with plaintiffs' proposed standard "is that it has no basis in the text of the statute." *Swift*, 144 F.4th at 770 (citation and internal quotations omitted). Indeed, the only word from plaintiffs' proposed standard that appears in I.R.C. §6707A(c)(1) is "with." This Court should resist plaintiffs' invitation to "read[ ] words or elements into [the] statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997).

In advocating for a different result, plaintiffs focus on a purported distinction between "potential" tax avoidance and "possible" tax avoidance. (Br. 60-61.) This distinction does not withstand scrutiny, as "potential," by definition, "express[es] possibility." https://www.merriam-webster.com/dictionary/potential. Nor can plaintiffs breathe life into their purported distinction by emphasizing that "potential" means "having or showing the *capacity* to develop into something in the future." (Br. 60-61 (quoting OXFORD ENGLISH DICTIONARY (online edition)) (emphasis added).) "Capacity" means "the quality or condition of admitting or being open to action or treatment;

capability, *possibility*." OXFORD ENGLISH DICTIONARY (2d ed. 1989) (emphasis added).

Pivoting, plaintiffs contend that their standard is necessary to prevent Treasury from designating a reportable transaction based on the "bare theoretical possibility" that a class of arrangements has the potential for tax avoidance or evasion. (Br. 63-64.) But this ignores the familiar "reasoned decisionmaking" standard that governs APA claims. *Ryan*, 2026 WL 1847197, at *8. To designate a class of arrangements as reportable transactions, Treasury must "consider[ ] the relevant facts" and "articulate[ ] a satisfactory explanation," *Barr*, 114 F.4th at 446, as to why it "determine[d]" that the arrangements are "of a type … having a potential for tax avoidance or evasion," I.R.C. §6707A(c)(1). Indiscriminately designating all "mortgage-interest deductions, retirement-account contributions, [or] charitable donations" as reportable transactions, as plaintiffs suggest (Br. 64), would not satisfy this standard. Nothing in the District Court's opinion suggests otherwise.

Plaintiffs invoke the major questions doctrine (Br. 59, 63-64), but to no avail. As explained at pp. 6-7, *supra*, information reporting is the

bedrock of our federal tax system. *Bisceglia*, 420 U.S. at 145. Congress has therefore long required that "any person made liable for any tax … shall make a return or statement according to the forms and regulations prescribed by the Secretary [of the Treasury]." I.R.C. §6011(a); *see CIC Servs.*, 593 U.S. at 212 ("As every taxpayer knows, the Internal Revenue Service (IRS) has broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes."). The reportable transaction regime is a modest application of that requirement, in which Treasury can require that taxpayers claiming a prone-to-abuse tax benefit supply the IRS with information about their entitlement to that benefit, *see* Treas. Reg. §1.6011-4, backstopped by penalties for taxpayers' noncompliance, *see* I.R.C. §6707A. It does not, either generally or with respect to the regulations here, carry "vast political or economic significance." *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 616 (5th Cir. 2024); (*see* ROA.24926 (describing rule's "two-page reporting requirement" as imposing a "low" burden)). And even if it did, I.R.C. §§6011 and 6707A provide "clear congressional authorization" to require such information reporting. *Mayfield*, 117 F.4th at 616.

c. Plaintiffs also invoke the *Chenery* doctrine (Br. 56-57), under which courts generally will not sustain agency action on grounds upon which the agency itself did not rely. *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 95 (1943). According to plaintiffs, Treasury took the position that it can designate an arrangement as a transaction of interest only if it is "consistently" associated with tax avoidance, and they now seek to hold Treasury to that standard. This argument fails twice over.

First, the *Chenery* doctrine applies to agency "determination[s] of policy or judgment which the agency alone is authorized to make." *Chenery*, 318 U.S. at 95. Questions of statutory interpretation, however, are legal determinations on which courts have the last word. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024). Thus, *Chenery* is inapplicable where, as here, the issue is the best reading of a statute.[5] *See*, *e.g.*, *Ark. AFL-CIO v. F.C.C.*, 11 F.3d 1430, 1440 (8th Cir. 1993); *Ward v. Merit Sys. Prot. Bd.*, 981 F.2d 521, 527-28 (Fed. Cir. 1992).

[5] *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024) (Br. 57) did not hold to the contrary, and it is unclear why plaintiffs think that it did.

Second, in the Final Rule, Treasury stated that it had determined the transaction-of-interest regulation "identif[ied] fact patterns that are consistently associated with [micro-captive insurance] transactions that … may be tax avoidance transactions." 90 Fed. Reg. at 3,546. Treasury did not, however, state that such a determination was a requirement to designate a new transaction-of-interest category, much less that importing such a requirement into I.R.C. §6707A(c)(1) represented the best reading of the statute. Whatever the precise contours of the *Chenery* doctrine, it cannot be used to hold Treasury to a position that Treasury did not take.

d. Throughout their brief, plaintiffs also make a related *Chenery* argument, as follows. In promulgating the transaction-of-interest regulation, Treasury stated that it had identified fact patterns "consistently" associated with transactions that may be tax avoidant. In upholding the regulation, the District Court held that Treasury had reasonably identified facts patterns associated with the "potential" for tax avoidance. Because a standard grounded in potentiality is not the same as a standard grounded in consistency, plaintiffs argue that the

court violated the *Chenery* doctrine. (E.g., Br. 6, 48, 56-57.) This argument does not hold water.

Initially, the question before the District Court was whether the administrative record shows that Treasury engaged in reasoned decisionmaking when it determined that the arrangements covered by Treas. Reg. §1.6011-11 are "of a type … having a potential for tax avoidance or evasion." I.R.C. §6707A(c)(1). The court answered that question, and it did so correctly. *See also Ryan*, 2026 WL 1847197, at *9-16; *CIC Servs.*, 2026 WL 622836, at *3-9, Treasury's statement about the consistency with which such arrangements are or may be tax avoidant was a "determination of policy or judgment" in support of the relevant legal standard, *see Chenery*, 318 U.S. at 95, not a substitute for that standard.

Furthermore, "the *Chenery* doctrine is not applied inflexibly." *Fleshman v. West*, 138 F.3d 1429, 1433 (Fed. Cir. 1998); *see Bruckner Truck Sales, Inc. v. Guzman*, 148 F.4th 341, 346 (5th Cir. 2025). Treasury's determination that the fact patterns identified in Treas. Reg. §1.6011-11 "are consistently associated with transactions that are or may be tax avoidance transactions," *see* 90 Fed. Reg. at 3,546,

necessarily included the subsidiary determination required to designate an arrangement as a transaction of interest. *Cf. Green v. Sec'y, Dep't of Corrections*, 28 F.4th 1089, 1147-48 (11th Cir. 2022). To reiterate, Treasury was required to determine that those fact patterns are "of a type … having a potential for tax avoidance or evasion," I.R.C. §6707A(c)(1), and the administrative record shows that Treasury did so. In any event, we demonstrate below that the administrative record supports the District Court's holding that the transaction-of-interest regulation was reasonable by any standard.

### 2. Treasury's identification of a new transaction-of-interest category was reasonable and reasonably explained

We now turn to the substance of the transaction-of-interest rule. As relevant here, a taxpayer or material advisor must disclose its involvement in an insurance arrangement if the arrangement satisfies both (a) the relationship test and (b) either the loss-factor ratio or related-party financing factor. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1), (c)(1) & (2). Each component is reasonable and reasonably explained, as the District Court and two other district courts have held.

#### a. The relationship test is reasonable and consistent with the relevant statutory scheme

As discussed at p. 16, *supra*, an insurance arrangement must meet certain structural characteristics to fall within the transaction-of-interest category. To wit, the arrangement must involve a small, closely held insurance company that elects, under I.R.C. §831(b), not to be taxed on its premium income. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1). For purposes of the rule, an insurance company is closely held if at least 20% of its assets, voting power, or outstanding stock or equity interests is directly or indirectly owned by an insured party, an owner of an insured party, or persons related thereto. *Id.* §§1.6011-10(b)(1)(iii), 1.6011-11(b)(1). Treasury reasonably determined that this structure creates an opportunity to avoid or evade taxes.

##### i. The relationship test is reasonable

a. Initially, the relationship test is designed to ensure that the reporting requirement only covers captive insurance arrangements, not arrangements in which the insurer and insured are unrelated parties operating at arm's-length. (ROA.24887 ("The Relationship Test puts the 'captive' in the "micro-captive" regulations.").) This is eminently reasonable, because the IRS, courts, and practitioners all agree that

captive insurance arrangements can be used for tax avoidance or evasion. *Supra*, pp. 10-13.

Additionally, the relationship test focuses on captive insurance arrangements where ownership or control is concentrated among a small number of related individuals or entities. Treas. Reg. §§1.6011-10(b)(1), 1.6011-11(b)(1). This, too, is reasonable, as "the closely held nature of the arrangement"—combined with common ownership between the insurer and the insureds—creates an opportunity to conduct business in a manner inconsistent with arm's-length transactions and sound business practices. 90 Fed. Reg. at 3,539, 3,552; *see also id.* at 3,550-51 ("Because these transactions involve closely held related entities, there is little to no barrier to the manufacture of claims in these arrangements."); 88 Fed. Reg. at 21,552 (rule "identif[ies] a threshold at which a lack of diversification may facilitate abuse"). And the rule's 20% threshold is drawn from the test that Congress devised to curtail closely held family businesses' improper use of captive insurance arrangements for estate-planning purposes, rather than risk management. 88 Fed. Reg. at 21,552; *infra*, pp. 43-46.

Furthermore, as the District Court concluded, the relationship test is designed to "to exclude arrangements less likely to be tax avoidant, such as small mutual insurers with diversified ownership." (ROA.24887); *accord CIC Servs.*, 2026 WL 622836 at *8. Put simply, the relationship test "is reasonable and reasonably explained." *Ryan*, 2026 WL 1847197, at *16.

b. Plaintiffs' scattershot attacks on the relationship test lack merit. First, plaintiffs assert that Treasury failed to establish a nexus between tax-avoidant insurance arrangements and common ownership between the insurer and the insureds. (Br. 46.) This assertion is belied by the administrative record, which includes both reasoning and caselaw establishing such a nexus. 90 Fed. Reg. at 3,539, 3,541, 3,550-52 (citing *Avrahami*, 149 T.C. at 194-98; *Syzygy v. Commissioner*, T.C. Memo. 2019-34, at *33-34; *Caylor v. Commissioner*, T.C. Memo. 2021-30, at *45-47; *Keating v. Commissioner*, T.C. Memo. 2024-2, at *59-61; *Swift*, T.C. Memo. 2024-13, at *40-42; *Patel v. Commissioner*, T.C. Memo. 2024-34, at *48-50; *Royalty Mgmt. Insur. Co., Ltd. v. Commissioner*, T.C. Memo. 2024-87, at *23, 46-48).

Second, plaintiffs suggest that Treasury failed to justify its choice of a 20% ownership threshold, rather than a lower threshold. (Br. 48.) As we have explained, the administrative record shows that the 20% threshold was drawn from a test devised by Congress. *Supra*, p. 38. Plaintiffs fail to engage with Treasury's reasoning on this score and have, therefore, forfeited any challenge to the sufficiency thereof. *See Castille v. Port Arthur ISD*, 168 F.4th 240, 257 & n.56 (5th Cir. 2026) (issues not raised in opening brief are waived).

Third, plaintiffs point out that an insurance arrangement is not tax avoidant simply because the insurer and insureds share common ownership. (Br. 46.) We agree. But it does not follow that this ownership structure is irrelevant, as the District Court correctly recognized. (ROA.24914.) To the contrary, the risk that an insurer is "acting as a mere self-insurance reserve or otherwise not acting as a legitimate insurance provider is heightened when the insurer and the insured are under common ownership." (ROA.24914); *see Ryan*, 2026 WL 1847197, at *2. This bears directly on whether the insured has, in fact, transferred its risk of loss, as required to constitute insurance for federal tax purposes. 90 Fed. Reg. at 3,539-40 (citing *Harper Group v.*

*Commissioner*, 96 T.C. 45, 46 n.2 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992); *Stearns-Roger Corp. v. United States*, 774 F.2d 414, 415 (10th Cir. 1985)); *Avrahami*, 149 T.C. at 174; 90 Fed. Reg. at 3,538 (citing *Avrahami*). Plaintiffs' own cited authority confirms this point. *Humana Inc. v. Commissioner*, 881 F.2d 247, 251-52 (6th Cir. 1989) (Br. 46).

Fourth, plaintiffs argue that the relationship test serves, at best, to screen out insurance arrangements with less potential for tax avoidance or evasion, rather than identifying arrangements with greater potential. (Br. 46-48.) But these are two sides of the same coin. By screening out lower risk arrangements (*i.e.*, large insurers, non-captive insurers, and insurers with diversified ownership structures), Treasury is necessarily left with a pool of higher risk arrangements (*i.e.*, small, closely held captives). The District Court correctly saw this argument for what it was: a policy disagreement, not an APA violation. (ROA.24920 n.6.)

Fifth, plaintiffs contend that the relationship test is invalid because it may not perfectly capture the precise contours of potentially tax-avoidant insurance arrangements. (Br. 48.) But as we have

explained, a transaction of interest—like other species of reportable transactions—need only be "of a type which the Secretary determines as having a potential for tax avoidance or evasion." I.R.C. §6707A(c)(1) (emphasis added); (ROA.24896). Here, Treasury reasonably concluded that the risk of an illegitimate transaction "is higher where companies are related and controlled by common ownership." (ROA.24915 (collecting cases).) The reporting requirement based, in part, on the insurer's ownership structure, is therefore appropriate so that the IRS can, armed "[w]ith that information, … check for facts—like coverage for an implausible risk or premiums that significantly exceed prevailing rates—suggesting that the taxpayer is not entitled to the tax benefit it claims." *CIC Servs.*, 593 U.S. at 213-14.

Indeed, even outside the reportable-transaction context, it is well-established that a regulation is not arbitrary and capricious simply because it "might be over- or under-inclusive." *U.S. Sportsmens' Alliance Found. v. Ctrs. for Disease Control and Prevention*, 167 F.4th 813, 822 (6th Cir. 2026)); *accord TMJ Implants, Inc. v. U.S. Dep't of Health & Human Servs.*, 584 F.3d 1290, 1294-95 (10th Cir. 2009); *United States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999).

Where Treasury has "articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," this Court should decline plaintiffs' invitation to second-guess the degree to which the regulations are "truly necessary or effective." *U.S. Sportsmens' Alliance*, 167 F.4th at 821-22.

At all events, the transaction-of-interest rule does not require that an insurance arrangement be reported simply because it involves a small, closely held captive. Rather, the rule only kicks in for a small, closely held captive if it excludes premiums from income under I.R.C. §831(b) and either the loss-ratio or related-party financing factor is also satisfied.

**ii. The relationship test is consistent with the relevant statutory scheme**

a. As discussed, there is no evidence that Congress had captive insurance arrangements in mind when it enacted I.R.C. §831(b) in 1986. *Supra*, p. 12 n.2. However, Congress did have captives in mind approximately 30 years later when it amended §831(b) via the Protecting Americans from Tax Hikes Act of 2015 ("PATH Act"), P.L. 114-113, 129 Stat. 2242, 3040, 3106-3107, Div. Q. The PATH Act addressed closely held family businesses using captive insurance

arrangements for estate-planning purposes, rather than risk management. (ROA.4306-4308.) For example, a business in which a father and son held 70% and 30% ownership interests, respectively, might establish a captive insurer owned solely by the son. (ROA.4308.) In that example, the business could pay up to $2.2 million in premiums to the captive each year and thereby increase the son's interest in the cash from $660,000 (*i.e.*, 30%) to $2.2 million (*i.e.*, 100%), without triggering estate and gift taxes. (*Id.*)

To address this issue, the PATH Act limited the ability of closely held insurers to make an I.R.C. §831(b) election. As amended, the provision provides that an insurer is generally ineligible to make an §831(b) election if more than 20% of its net written premiums is attributable to a single policyholder. I.R.C. §831(b)(2)(B)(i)(I). A captive with more than 20% of its premiums attributable to a single policyholder can only make an §831(b) election if lineal descendants, spouses, and other "specified holders" own roughly equal interests in the insured business and the captive insurer. I.R.C. §831(b)(2)(B)(i)(II), (B)(ii)-(iii). Thus, in the example above, the captive insurer would not be eligible to make an §831(b) election because the son's interest in the

captive (100%) far exceeds his interest in the insured business (30%). (ROA.4308.)

b. Plaintiffs seize on the above limitation and argue that, by prohibiting captive insurers with certain ownership structures from making an I.R.C. §831(b) election, Congress "affirmatively created … a pathway" for all other captives to establish their legitimacy. (Br. 52.) This badly misreads the prohibition.

According to plaintiffs, the amendment to I.R.C. §831(b) represented Congress's "judgment about which ownership structures warrant the election"—full stop. (Br. 53-54.) But as the District Court explained, "courts do not 'indulge in the loose assumption that when Congress adopts a new' statute, 'it thereby deals with all situations falling within the general mischief which gave rise to the legislation.'" (ROA.24901 (quoting *Kirschbaum v. Walling*, 316 U.S. 517, 521 (1942)). After all, "statutes 'may,' and often do, 'take one step at a time, addressing [themselves] to the phase of the problem which seems most acute …'" (ROA.24901 (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955).)

This is what Congress did here. The provision's text and purpose reflect that the change narrowed a preexisting tax election, *see* I.R.C. §831(b)(2)(B), and ensured that the narrowing impacted only closely held family businesses, *see id.* §831(b)(2)(B)(i)(II), (ii)-(iv). The provision's history also reflects that the change was designed to address "abuse of captive insurance arrangements for estate planning purposes." S. Rep. No. 114-16, at 3 (2015). Thus, the District Court correctly held that the provision is best understood as "stamp[ing] out only the worst abuses and the most likely tax-evasive transactions" at that time—namely, closely held family businesses using captives for estate-planning purposes. (ROA.24901.)

Indeed, as the *Ryan* court recognized, "[i]t is hard to see any limiting principle" to the contrary argument advanced by plaintiffs. *Ryan*, 2025 WL 3089415, at *11 & n.9. For example, Congress granted pass-through taxation status to "S Corporations," but that does not mean that any reportable transaction designation that covers some S Corporations necessarily undermines congressional intent. *Id.* The same follows here, for purported insurance companies making an I.R.C. §831(b) election.

Nor is there merit to plaintiffs' claim that the reporting requirement "would effectively eliminate the section 831(b) election for all or most small captive insurance companies." (Br. 52-53 (citing ROA.14750-14751).) As the District Court explained, "There is little incentive to avoid a minimal reporting requirement that does not affect the legitimacy of a claimed tax benefit—unless the taxpayer believes it may be not providing legitimate insurance." (ROA.24927 n.9.) Plaintiffs offer no response.

c. Plaintiffs' reliance on proposed legislation that was never enacted is even farther afield. (Br. 52-53.) It is well-established that Congressional inaction "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990).

Moreover, there is significant daylight between the proposed legislation and the transaction-of-interest designation in Treas. Reg. §1.6011-11. The former barred any captive from making an I.R.C. §831(b) election if more than 20% of its net written premiums were attributable to a single policyholder. (ROA.4095; *see* ROA.6149-6150.) The latter simply imposes a reporting requirement on insurers with

such ownership structures if the arrangement also has one or more other characteristics commonly associated with tax evasion or avoidance. In addition, the former would have barred any captive from making an §831(b) election if it entered into a reinsurance arrangement. (ROA.4095.) The latter does no such thing.

#### b. The loss-ratio and related-party financing factors are reasonable

As we have explained, the District Court correctly held that Treasury engaged in reasoned decisionmaking when it determined that an opportunity to potentially evade or avoid taxes exists where a small, closely held captive's ownership or control is concentrated among a small number of related individuals or entities. The court also correctly determined that Treasury engaged in reasoned decisionmaking when it determined that, where such a captive also satisfies the transaction of interest's loss-ratio or related-party financing factor, the arrangement may, in fact, have been used to avoid or evade tax and warrants additional scrutiny.

##### i. The loss-ratio factor is reasonable

a. Treasury's central concern with micro-captive insurance arrangements is that taxpayers may use them not as a legitimate risk-

management device, but rather to achieve "the indefinite deferral of tax." 90 Fed. Reg. at 3,546. One telltale sign of a tax-avoidant arrangement is that the insured pays outsized premiums for coverage that it does not really need. *Supra*, p. 10. As such, it is a "strong indicator of tax avoidance" if an insured pays "premiums far in excess of what is reasonably needed to fund insurance operations." 90 Fed. Reg. at 3,540; *see id.* ("excessive pricing of premiums and artificially low or nonexistent claims activity" is "inconsistent with insurance for Federal tax purposes"). After all, "[t]he pricing of premiums should naturally reflect the economic reality of insurance operations, to ensure that policies are 'price[d] in such a way that the premiums brought in cover losses and the insurer's business expenses with enough profit left over to keep investors happy.'" *Id.* at 3,540 (quoting *Avrahami*, 149 T.C. at 152). Where those economic realities are consistently ignored, it is apparent that the arrangement is being used to maximize the tax benefits available under I.R.C. §831(b) "without regard to reasonable estimates for loss experience." 90 Fed. Reg. at 3,541 (citing *Avrahami*, 149 T.C. at 194-98; *Syzygy v. Commissioner*, T.C. Memo. 2019-34, at *33-34; *Caylor v. Commissioner*, T.C. Memo. 2021-30, at *45-47; *Keating*

*v. Commissioner*, T.C. Memo. 2024-2, at *59-61; *Swift*, T.C. Memo. 2024-13, at *40-42; *Patel v. Commissioner*, T.C. Memo. 2024-34, at *48-50; *Royalty Mgmt. Insur. Co., Ltd. v. Commissioner*, T.C. Memo. 2024-87, at *23, 46-48).

To address this concern, the transaction-of-interest rule focuses on captive insurance arrangements in which the insurer has a below-average loss ratio. 90 Fed. Reg. at 3,541-43. In its simplest terms, a loss ratio is the sum of the expenses that an insurer incurs paying claims and claim-related expenses, divided by the amount collected in premiums:

$$\text{loss ratio} = \frac{\text{(incurred losses + claim expenses)}}{\text{earned premiums}}$$

88 Fed. Reg. at 21,553.[6] A legitimate insurer operating at arm's length with a consistently low loss ratio would, as a matter of economics, be expected to lower its premiums (or issue dividends to policyholders) to

---

[6] The National Association of Insurance Commissioners ("NAIC") calculates an insurer's annual loss ratio as the sum of the net amounts paid out in claims and claim administration expenses, divided by net premiums earned. 88 Fed. Reg. at 21,553. The regulation's methodology differs from NAIC's insofar as it adds additional claim administration expenses to the numerator, subtracts policyholder dividends from the denominator, and is calculated over a period of (up to) 10 years. Treas. Reg. §1.6011-11(c)(2).

avoid losing customers to competitors charging lower premiums.

90 Fed. Reg. at 3,540-41. It is unsurprising, then, that "a litany of data suggest[s] that micro-captives involved in tax-avoidance schemes invariably have loss ratios falling significantly below industry averages." *Ryan*, 2026 WL 1847197, at *10.

To identify captive arrangements with potential for tax avoidance or evasion, the transaction-of-interest rule sets a modified loss ratio at 60%, which Treasury determined was below the lowest industry average supported by available data. 90 Fed. Reg. at 3,541-43. For context, health insurers are entitled to certain tax benefits only if their loss ratio is at least 85%, and NAIC reported that the average annual loss ratio for property and casualty insurers was between 67.2% and 76.2% from 2012 to 2021. *Id.* at 3,542-43; 88 Fed. Reg. at 21,552-53. Even when high frequency, low severity lines of coverage were removed from the NAIC data, and NAIC's methodology was adjusted to align with the methodology used in the regulation, the average loss ratio for property and casualty insurers was approximately 66% or 67%–above the 60% loss ratio used in the final rule. 90 Fed. Reg. at 3,542. And the 60% loss ratio is calculated over the last 10 years of the captive's

existence (or the entirety of the captive's existence, if it has been in existence for less than 10 years), ensuring that the below-average loss ratio is not an anomaly. *Id.* at 3,541.

Three district courts have concluded that Treasury's use of a 60% loss ratio was reasonable, including the District Court here. The *Ryan* court held that the "chosen loss ratio for [transactions of interest] was indeed reasonable and reasonably explained," where Treasury started with industry data, made adjustments to account for differences between that data and the type of coverage typically offered by small captives, and took into account comments received during the rulemaking process. 2026 WL 1847197, at *12-13. The *CIC Services* court similarly held that Treasury had "follow[ed] a reasonably discernible path" in using a below-average loss ratio "to identify situations in which a captive arrangement may not be functioning like insurance in the commonly accepted sense." 2026 WL 622836, at *7. And the District Court here held that the administrative record "lays out" the logic behind this factor and "shows that the agency considered and reasonably rejected the commenters' objections to the Loss-Ratio Factor." (ROA.24919.)

b. Plaintiffs do not dispute that an insurer's history of below-average loss ratios can be an indicator of tax avoidance or evasion. However, they make a series of arguments about why Treasury should not have used the NAIC data to derive the applicable loss ratio or, alternatively, why Treasury should have derived a lower loss ratio from that data. (Br. 33-38.) None withstand scrutiny.

First, plaintiffs argue that the NAIC data is irrelevant because it "does not contain captives at all." (Br. 33.) However, they immediately walk that claim back and admit that some captives do, in fact, report data to NAIC. (*Id.*; *see* ROA.6239 (estimating that NAIC data represents "well in excess of 95% of the premiums written in the United States").) Regardless, the APA does not require that agencies base their decisions on "perfect empirical or statistical data." *Prometheus Radio*, 592 U.S. at 427. It is sufficient that agencies "acknowledge[ ] the gaps in the data" they have, ask stakeholders if better data is available, and make "a reasonable predictive judgment based on the evidence" before them. *Id.* This is precisely what Treasury did here, where neither the NAIC data nor any other available dataset "would capture the experience of the vast majority of captive insurance companies,

including micro-captive insurance companies," and Treasury made adjustments to the NAIC data to account for differences between commercial insurers and captives. 90 Fed. Reg. at 3,542 (citation and internal quotations omitted).

Plaintiffs cite *CFM Ins., Inc. v. Commissioner*, T.C. Memo. 2025-83, *appeal docketed at* No. 26-1067 (7th Cir.), as having concluded that "measuring a captive against commercial-insurer figures is 'useless.'" (Br. 35.) But the actual *CFM* conclusion was far more limited. There, the Tax Court concluded that it was "useless" to compare commercial insurers' and captives' premium-to-surplus ratios without accounting for differences between the two markets. *CFM*, T.C. Memo. 2025-83 at *30 (citing *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1, 12 (2014)). However, as the District Court recognized, "[a] premium-to-surplus ratio is not the same as a loss ratio, *see Rent-A-Center*, 142 T.C. at 12, and the Final Rule attempted to adjust the loss ratio it used to account for the differences between commercial and micro-captive insurance, *see* Final Rule at 3,542." (ROA.24922.)

Second, plaintiffs focus on specific differences between commercial insurers and captives that have the potential to impact their respective

loss ratios. (Br. 34, 36-37.) However, none renders unreasonable the 65% average that Treasury derived from the NAIC data.

Initially, plaintiffs note that commercial insurers are more likely than captives to underwrite high frequency, low severity lines of coverage. (Br. 34, 36-37.) But Treasury accounted for this difference by removing such lines of coverage from the NAIC data and then recalculating the loss ratio. 90 Fed. Reg. at 3,541-43. Even after doing so, the 60% loss ratio chosen for the final rule was still below the industry average. *Id.* This is, therefore, not a case in which Treasury blindly engaged in “cross-industry benchmarking” without regard to differences between the relevant markets. (Br. 35.) Indeed, in holding that Treasury’s chosen loss ratio was reasonable, the District Court and the *Ryan* court both credited Treasury’s adjustments to the NAIC data. (ROA.24925 n.8); *Ryan*, 2026 WL 1847197, at *12.

Plaintiffs further note that commercial insurers and captive insurers have different overhead costs. (Br. 34.) But as the District Court recognized, this undermines plaintiffs’ argument because they have conceded that captives’ overhead costs are *lower* than commercial insurers’, meaning that Treasury should have actually set the

applicable loss ratio *higher*. (ROA.24924-24925 & n.7.) Again invoking the *Chenery* doctrine, plaintiffs complain that it was improper for the District Court to rely on their concession because they had not yet made it when the regulations were promulgated. (Br. 32.) But we are aware of no case holding that *Chenery* precludes a court from relying on a party's concession in litigation.

Relatedly, plaintiffs note that one commenter suggested breaking down the applicable loss ratio on a state-by-state and coverage-by-coverage basis. (Br. 37 (citing ROA.5147, ROA.5494-5495).) However, this approach would have resulted in a rule with hundreds (if not thousands) of loss ratios, and Treasury reasonably rejected it on administrability grounds. 90 Fed. Reg. at 3,545. Moreover, the commenter's assertions about how many "line-state combinations" fell below the 65% average determined by Treasury is not an apples-to-apples comparison, as it uses NAIC's loss-ratio methodology rather than Treasury's modified loss-ratio methodology. (ROA.5147, ROA.5494-5495.) Those assertions also appear to be grounded in background data that was not provided to Treasury, further rendering them inapposite.

Third, plaintiffs point out (Br. 35) that NAIC cautions against relying solely on its data "to determine whether [an insurer's] current rates are adequate to cover future costs." (ROA.6239.) Although the data "provide[s] some indication as to whether premiums have been sufficient to cover costs in the past," a particular insurer's solvency must also take into account the specific coverages offered and their "underlying characteristics, including risk exposures, underwriting cycles, and economic climate." (*Id.*) Here, though, Treasury did not use the NAIC data to determine any individual insurer's solvency. Rather, it appropriately used the data "to understand a typical property and casualty company loss ratio." 90 Fed. Reg. at 3,542; *see Prometheus Radio*, 592 U.S. at 425.

Fourth, an expert report in the administrative record confirms, rather than refutes, the reasonableness of the average loss ratio that Treasury derived from the NAIC data. (Br. 30.) The expert acknowledged that a reasonable loss ratio for a captive insurer could, under the right circumstances, fall anywhere "between 10% and 90%" in a given year. (ROA.17533.) However, the expert opined that, in general, "[f]or a captive with low expenses, it might be reasonable to

expect that the loss ratio should stay relatively high, usually higher than 65%." (ROA.17539.) And the expert's opinion was based on the NAIC methodology that, unlike the regulations, (i) excludes certain claim administration expenses and policyholder dividends and (ii) is calculated for one year rather than a period of up to 10 years. *Supra*, p. 50 & n.6. Together, these differences would raise the expected loss ratio even higher.

Fifth, plaintiffs argue that Treasury should have jettisoned the NAIC data in favor of data compiled by AM Best Company because the latter was limited to "small insurance companies," defined as insurers with "capital and surplus up to $10 million." (Br. 36-37); 90 Fed. Reg. at 3,542. However, it is undisputed that neither "would capture the experience of the vast majority of captive insurance companies, including micro-captive insurance companies." 90 Fed. Reg. at 3,542 (citation and internal quotations omitted). It is likewise undisputed that both suffer from one of the same flaws: they include coverages "such as personal automobile liability and homeowner's liability … that micro-captives are not generally permitted to cover." *Id.* Importantly, though, the AM Best data—unlike the NAIC data—was provided in a

table that did not include breakdowns between lines of coverage and, correspondingly, was not amenable to adjustments to remove high frequency, low severity lines of coverage. (ROA.24922-24923); 90 Fed. Reg. at 3,542. The District Court therefore concluded that it was reasonable for Treasury to prefer the imperfect NAIC data over the imperfect AM Best data. (ROA.24922-24923 (citing 90 Fed. Reg. at 3,542)); *accord Ryan*, 2026 WL 1847197, at *12 n.4 (citing 90 Fed. Reg. at 3,542).

c. Plaintiffs' remaining arguments about the loss ratio are similarly unavailing. Plaintiffs initially argue that the cases cited in the administrative record do not support the specific loss ratio Treasury chose. (Br. 28-30.) This is beside the point. Those cases demonstrate that a below-average loss ratio is consistently associated with arrangements that do not constitute insurance for federal tax purposes. *Supra*, pp. 49-51. To determine the loss ratio used in the transaction-of-interest regulation, Treasury used the NAIC data.

Plaintiffs rely heavily on *R.V.I. Guar. Co. & Subsidiaries v. Commissioner*, 145 T.C. 209, 215-26 (2015), where the Tax Court concluded that an arrangement with an average loss ratio of 32% over a

13-year period constituted insurance for federal tax purposes. (Br. 28-30.) As the District Court noted, though, *R.V.I.* involved a large, non-captive insurer that issued extraordinary policies providing "catastrophic-type coverage" and was, therefore, of limited value in establishing an appropriate metric for the mine-run of small captive insurers. (ROA.24925 n.8); *see CIC Servs.*, 2026 WL 622836, at *7 n.1.

Nor did Treasury suggest otherwise during the rulemaking process, as plaintiffs intimate. (Br. 30.) Treasury received numerous comments suggesting that, because involvement in a listed transaction carries the potential for a higher maximum penalty than a transaction of interest, the loss ratio should be lower. 90 Fed. Reg. at 3,540-41. But the commenters could not point to any publicly available data justifying a significant reduction from the average loss ratio derived from the NAIC data. *Id.* at 3,542. They did, however, point to the Tax Court's opinion in *R.V.I.* *Id.* at 3,541 (citing 145 T.C. at 215-16). In an effort to accommodate the commenters' concerns, Treasury adopted a 30% loss ratio for listed transactions that was drawn from *R.V.I.* 90 Fed. Reg. at 3,541. Thus, Treasury drew upon the *R.V.I.* loss ratio because it wanted to accommodate the concerns of commenters, and 30% was the

lowest possible metric that could be justified by publicly available data. *Id.* at 3,540-41.

Plaintiffs next argue that, because some micro-captives underwrite policies covering against catastrophic risks like terrorist attacks, they may legitimately maintain a loss ratio well below the industry average for many years. (Br. 30-32.) This argument fails for two reasons. First, there is no reason to believe that any significant number of small, closely held captives underwrites catastrophic-risk policies and only catastrophic-risk policies. Second, as the District Court recognized, a micro-captive insurance arrangement created only to underwrite such policies “may present a high risk of abuse, because a taxpayer could be willing to spend the insurer’s reserves on the unlikely chance that they will ever be needed.” (ROA.24290-24291 (citing *Avrahami*, 149 T.C. at 190; *Caylor*, T.C. Memo. 2021-30, at *15, *Keating*, T.C. Memo. 2024-2, at *31)); 90 Fed. Reg. at 3,545 (citing *Avrahami*, *Caylor*, and *Keating*). Plaintiffs fail to address the court’s reasoning and have, therefore, forfeited any challenge thereto. *See Castille*, 168 F.4th at 257 & n.56.

In effect, plaintiffs are simply renewing their overinclusiveness argument by complaining that the loss-ratio factor may capture some captive arrangements that are not, in fact, tax avoidant. But as we explained at pp. 41-43, *supra*, "overbreadth[ ] is not automatically unreasonable." *Ryan*, 2026 WL 1847197, at *14. The purpose of the transaction-of-interest rule is to "trigger[ ] reporting requirements that may allow the Treasury Department and IRS to more accurately identify whether certain arrangements are 'for insurance.'" *CIC Servs.*, 2026 WL 622836, at *8; (ROA.24907-24908); *accord CIC Servs.*, 593 U.S. at 213-14. There is no serious dispute that Treas. Reg. §1.6011-11's loss-ratio factor does just that.

In a footnote, plaintiffs contend that the loss ratio factor "creates perverse incentives" by pressuring captives into lowering their premiums, paying policyholder dividends, or manufacturing claims. (Br. 38-39 n.9 (characterizing the loss ratio factor as a threat to insurer solvency).) But as Treasury noted during the rulemaking process, this concern is misplaced:

> Captive insurers would avoid insolvency in the same way they always have; that is, by insuring risks that are selected and duly reserved for in accordance with sound business judgment and the regulatory requirements of their domicile.

90 Fed. Reg. at 3,545. The District Court agreed. (ROA.24927 n.9.) Here again, plaintiffs fail to engage with the reasoning of Treasury and the District Court, and they therefore forfeit any challenge to the sufficiency thereof. *See Castille*, 168 F.4th at 257 & n.56.

As a last resort, plaintiffs argue that the transaction-of-interest regulation's 60% loss ratio was not sufficiently below the 65% average derived from the NAIC data. (Br. 37.) But plaintiffs' disagreement with Treasury's policy choice does not establish that the reporting requirement is arbitrary and capricious any more than their argument that the choice rendered the requirement over-inclusive. *Supra*, pp. 41-43, 62. As the District Court concluded, Treasury is "reasonably skeptical of insurance transactions that generate unnecessary (even if modestly unnecessary) profits for captives, which may reflect non-deductible 'distributions of [the insured's] profits," rather than legitimate "expenses." (ROA.24926 (quoting *Caylor*, T.C. Memo. 2021-30, at *9).)

#### ii. The related-party financing factor is reasonable

a. As we have explained, Treasury's central concern with captive insurance arrangements is "the indefinite deferral of tax." 90 Fed. Reg. at 3,546. That concern "may be compounded by the use of tax-deferred income for the personal benefit of the related persons involved." *Id.* In particular, where the insurer loans premium payments back to its commonly owned insureds, those premium payments "have not only avoided ordinary taxation but have continued to avoid tax while back in the hands of the related parties who caused the premiums to be paid and deducted." *Id.* And the fact that the insurer is willing to loan premium payments back to the insured parties is an indication that the participants are confident the insurer's reserves will never be called upon to pay claims. (ROA.24920-24921 (citing *Keating*, T.C. Memo. 2024-2, at *31); 90 Fed. Reg. at 3,541 (citing *Keating*). Understood within this framework, the related-party financing factor "identifies the heart of the agency's tax-avoidance concern." (ROA.24916.)

As documented in the administrative record, this concern is borne out by caselaw evaluating the legitimacy of captive insurance

arrangements. Where one or more insureds pays premiums to an insurer, only to have the insurer return the funds to the insureds, the arrangement begins to "look[ ] suspiciously like a circular flow of funds." *Reserve Mechanical*, 34 F.4th at 905-06; 90 Fed. Reg. at 3,556 (citing *Reserve Mechanical*). "It is well settled that 'a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes.'" (ROA.24906 (quoting *Patel*, 165 T.C. at 194)); 90 Fed. Reg. at 3,546 (citing *Patel* T.C. Memo. 2024-34). Accordingly, an arrangement in which funds pass from the insured to the insurer and then back to the insured for something other than insured losses is less likely to constitute insurance for federal tax purposes. *Swift*, T.C. Memo. 2024-13 at *18-19; 90 Fed. Reg. at 3,546 (citing *Swift*). Indeed, even outside the tax context, "[i]nsurance regulators often raise their bureaucratic eyebrows at related-party dealings." *Avrahami*, 149 T.C. at 170; 90 Fed. Reg. at 3,546 (citing *Avrahami*).

b. Plaintiffs push back on the financing factor, stating that captive insurers "routinely" loan premium payments back to the related insureds that made the payments in the first place. (Br. 39.) But apart

from describing related-party financing as “routine,” plaintiffs neither quantify how frequently captives engage in this practice nor explain captives’ rationale for doing so. Regardless, even if this practice is routine, that does not negate its capacity to signal potential tax avoidance.

Of course, plaintiffs are correct that a captive insurer’s related-party financing is not always abusive or avoidant. (Br. 39.) But here again, “overbreadth[ ] is not automatically unreasonable.” *Ryan*, 2026 WL 1847197, at *14; *supra*, pp. 41-43, 62-63. And even where a court has determined that a captive’s related-party financing was legitimate, it did so only after acknowledging the concerns associated therewith and scrutinizing the financing’s terms. *Id.* (citing *Avrahami*, 149 T.C. at 168-71). The transaction-of-interest rule allows the IRS to perform precisely such scrutiny. *Id.* Although plaintiffs would have preferred a facts-and-circumstances test grounded in assessing insurer liquidity (Br. 40-41), Treasury reasonably rejected such a test as administratively unworkable. (ROA.24917-24918 (citing 90 Fed. Reg. at 3,546).)

Nor can plaintiffs avoid this result by recasting the financing factor as the "IRS's policy disagreement with the statutory scheme that Congress created." (Br. 44.) It is undoubtedly true that qualifying small insurers can elect to exclude their premiums from income, *see* I.R.C. §831(b), and that loan proceeds do not constitute income upon receipt because they are accompanied by an offsetting obligation to repay them, *see United States v. Rochelle*, 384 F.2d 748, 751 (5th Cir. 1967). But it is also true that taxpayers sometimes characterize arrangements as "insurance" or "loans" when they are, for federal tax purposes, something else. *Swift*, 144 F.4th at 764-69 (arrangement did not constitute *bona fide* insurance); *Rochelle*, 384 F.2d at 752 (arrangement did not constitute *bona fide* loan). Here, Treasury reasonably concluded that the presence of related-party financing makes it less likely that a small, closely held captive insurer is providing insurance for federal tax purposes, and that conclusion is amply supported by the administrative record. In short, plaintiffs have identified no authority which "stands for the proposition that related-party financing cannot signal a potential for tax avoidance," much less

cast doubt on Treasury's "ultimate decision that related-party financing reflects a potential for tax avoidance." *Ryan*, 2026 WL 1847197, at *14.

c. Nor is there anything problematic about Treasury's having relied on taxpayer examinations in addition to caselaw. (Br. 42-43.) An agency can, and should, "rely on its experience" in the regulated field when it engages in rulemaking. *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010); *see Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1322 (11th Cir. 2021) (citing *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 546-47 (D.C. Cir. 1997)). Here, the IRS has experience examining purported insurance arrangements and defending the results of those examinations in court, *see* 90 Fed. Reg. at 3,538, 3,544, 3,546, and Treasury reasonably drew on this experience when it issued the rules at issue (ROA.24916-24917 n.5).

To be sure, Treasury did not include files from current taxpayer examinations in the administrative record. (Br. 43.) Nor could it have, as those files must be kept confidential, under penalty of civil and criminal sanctions. I.R.C. §§6103(a), 7213, 7213A, 7431. This poses a unique obstacle to including examination data in the administrative record, as the District Court recognized. (ROA.24916-24917 n.5.) And

that obstacle cannot be overcome by simply redacting taxpayers' identifying information. *Ryan*, 2026 WL 1847197, at *9 (citing *Church of Scientology of Cal. v. I.R.S.*, 484 U.S. 9, 18 (1987)); *see also MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 13 (D.C. Cir. 1998) (upholding agency decision to exclude confidential information from the administrative record).

Of course, confidentiality concerns do not relieve an agency from the obligation to show that it engaged in reasoned decisionmaking. *In re NTE Conn.*, 26 F.4th 980, 988-89 (D.C. Cir. 2022) (Br. 43). But this is not a case in which Treasury has "cryptically asserted that it could not explain its decision because … [of] confidentiality concerns." *Id.* at 988. Rather, Treasury identified cases that were the result of taxpayer examinations and represented that the fact patterns associated with abusive arrangements therein were consistent with the fact patterns associated with abusive arrangements currently under examination. 90 Fed. Reg. at 3,538. Although plaintiffs may have preferred that Treasury "quantif[y] [its examination experience] in the form of a study," the APA imposes no such requirement. *Sacora*, 628 F.3d at 1069 (citing *State Farm*, 463 U.S. at 43).

### C. The District Court should be afforded the opportunity to determine an appropriate remedy for any defect in the transaction-of-interest regulation in the first instance

In passing, plaintiffs urge this Court to remand this case to the District Court "with instructions to vacate" Treas. Reg. §1.6011-11 "in its entirety." (Br. 65; see Br. 4, 6, 27.) This Court should uphold the regulation for the reasons set forth above. But if this Court should find any defect in that regulation, the case should be remanded to the District Court to determine an appropriate remedy. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (remanding for this purpose); *Texas*, 50 F.4th at 529 (vacatur decision reviewed for abuse of discretion). In doing so, the court should take into account what relief plaintiffs need to be made whole, the pendency of related litigation in another circuit, etc.[7] *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Green Rock*, 104 F.4th at 229 (setting aside listed-transaction rule as to the plaintiff only).

---

[7] A more detailed discussion of APA remedies is located at pp. 79-81, *infra*.

## II

### This Court should reverse the District Court's vacatur of Treas. Reg. §1.6011-10; if it finds the regulation invalid, the appropriate remedy is a remand to the District Court for further proceedings

### A. The District Court erred in holding that Treasury exceeded its authority when it identified certain micro-captive insurance arrangements as listed transactions

The District Court separately held that Treasury exceeded its statutory authority when it promulgated the listed-transaction rule. That holding conflicts with a decision by another district court, and it should be reversed.

1. As discussed at pp. 7-8, *supra*, Treasury is authorized to "specifically identif[y] … tax avoidance transaction[s]" as "listed transactions" that must be affirmatively disclosed to the agency. I.R.C. §6707A(c)(2); *see* Treas. Reg. §1.6011-4(b)(2). Like the transaction-of-interest rule, the listed-transaction rule used three criteria: (a) the relationship test, (b) the loss-ratio factor, and (c) the related-party financing factor. Treas. Reg. §1.6011-10(b)(1), (c)(1) & (2). However, the listed-transaction rule differs from the transaction-of-interest rule in two important respects.

First, in response to commenter concerns, Treasury dramatically reduced the loss-ratio factor, from 60% to 30%. 90 Fed. Reg. at 3,541. And Treasury provided that an arrangement would not qualify as a listed transaction unless the insurer had been in existence for at least a decade and maintained a loss ratio below 30% as computed over the preceding 10 years. *Id.* Second, unlike the transaction-of-interest rule, which was satisfied if *either* the loss-ratio or related-party financing factor was met, Treasury phrased the listed-transaction in the conjunctive, requiring that *both* be met. *Id.* Together, these changes "significantly narrow[ed] the scope" of the listed-transaction category. *Id.*

In sum, an arrangement was deemed tax avoidant only if it involved (a) a small, closely held captive that elected to exclude premiums from taxable income under I.R.C. §831(b), (b) maintained a substantially below-average loss ratio for at least a decade, *and* (c) nonetheless chose not to lower its premiums or issue dividends to its policyholders, but rather loaned its premium payments back to the commonly owned insureds or other affiliates in a tax-free way. Treasury expressly determined that such arrangements were abusive.

88 Fed. Reg. at 21,554; *see* 90 Fed. Reg. at 3,538, 3,546. And rightly so: there is no objective reason why a legitimate insurer would operate this way in the ordinary course. Consequently, the *CIC Services* court had little difficulty in holding that Treasury acted within its statutory authority when it promulgated Treas. Reg. §1.6011-10. 2026 WL 622836 at *4; *see also Ryan, LLC v. Internal Revenue Serv.*, 2025 WL 3089415, at *10-11 (N.D. Tex. Nov. 5, 2025) (dismissing exceeds-authority challenge).

2. The District Court, however, reached a different conclusion. (ROA.24909-24911.) It started with a proposition on which the parties agree: an arrangement designated as a "listed transaction" must have a greater likelihood of tax avoidance than merely being potentially tax avoidant. (ROA.24899; *see* Br. 13); *Green Rock*, 104 F.4th at 225 (describing listed transactions as "presumptively tax-avoidant," from Treasury's perspective). But the court then concluded that that administrative record did not "support a finding that the transactions designated by § 1.6011-10 are presumptively not really for insurance." (ROA.24909.) To support such a finding, the court opined that Treasury would have needed to determine the number of "captives [that] qualify

under § 1.6011-10," determine the number of "those qualifying captives [that] have been evading taxes," and then demonstrate that the qualifying transactions are tax avoidant most of the time. (ROA.24910.) This standard is incorrect for at least three reasons.

First, the District Court put the proverbial cart before the horse. The purpose of the listed-transaction regime is to require that taxpayers affirmatively disclose their participation in tax-avoidance transactions so the IRS can consider whether to examine them. *Supra*, p. 7. Or, as the court succinctly put it, the regime exists so "the government can find the tax-evader needles in the taxpayer haystack." (ROA.24898-24899); *Mann Constr.*, 27 F.4th at 1141 ("information-gathering imperative allows the government to ensure compliance with tax provisions and ferret out improper tax avoidance"). But the court's standard requires that the IRS identify and examine the full universe of tax-avoidant transactions *before* imposing a reporting requirement. In other words, the IRS must gather the information it needs before it can require that taxpayers report that information. This standard is unworkable and undermines congressional intent.

Second, the District Court failed to give sufficient weight to the discretion that Treasury is afforded in determining which transactions are reportable. In particular, Congress defined a "listed transaction" as one "specifically *identified by the Secretary* as a tax avoidance transaction." I.R.C. §6707A(c)(2) (emphasis added); *see* https://www.merriam-webster.com/dictionary/identify (defining "identify" as "to perceive or state the identity of (someone or something)"). Congress further invoked the Secretary's broad authority in I.R.C. §6011 to require information reporting. I.R.C. §6707A(c)(2); *see CIC Servs.*, 593 U.S. at 212. Nothing in the text, structure, or history of I.R.C. §6707A(c)(2) imposes the *per se* data requirement that the court read into it.

Indeed, reading I.R.C. §6707A(c)(2) as providing a standard built on deference to Treasury's judgment is consistent with the well-established distinction between whether a transaction is reportable and whether it should be respected for tax purposes. *Supra*, p. 8. After all, taxpayers remain free to dispute the IRS's characterization and have a court decide their liability *de novo*, without the listed-transaction designation placing a thumb on the scale. *CIC Servs.*, 2026 WL 622836,

at *8 n.2. That distinction is undermined by reading §6707A(c)(2) as providing a standard built on Treasury having to empirically establish that a transaction is tax avoidant before designating it as a listed transaction.

Finally, the District Court faulted the listed-transaction rule for encompassing "some legitimate transactions as well as those that are abusive." (ROA.24910.) But the listed-transaction regime requires only that Treasury "provide taxpayers with a 'bright line' and 'clear and objective' definition of the specific conduct that the Service considers presumptively suspicious and subject to heightened disclosure." *Green Rock*, 104 F.4th at 223 (citation omitted). In other words, Treasury is required to draw reasonable lines defining tax-avoidance transactions, not perfect lines. Nor would it be reasonable to require that Treasury draw perfect lines. In the micro-captive insurance context, for example, the IRS has successfully defended its adjustments in every case litigated on the merits in Tax Court, but it did lose a district-court jury trial concerning micro-captive promoters' liability for penalties. (ROA.24884 n.1.) If anything, this record bolsters—rather than undermines—Treasury's claim that it has the knowledge and

experience necessary to identify factors characteristic of tax-avoidant micro-captive arrangements.

3. Of course, the APA requires that Treasury explain *why* it designated a particular transaction as tax avoidant. But the sufficiency of Treasury's explanation is governed by arbitrary-and-capricious review, not the *de novo* review that governs in-excess-of-statutory-authority challenges and that was applied by the District Court. The listed-transaction regulation easily clears arbitrary-and-capricious review.

Treasury reviewed caselaw, examinations, industry data, and expert reports to "identify a set of recurring and consistent fact patterns indicating the lack of a non-tax business purpose in related-party transactions that purport to offer insurance for Federal tax purposes." 90 Fed. Reg. at 3,543; *see id.* at 3,546. It distilled those fact patterns into a set of "objective factors to ensure administrability and clarity for taxpayers whose transactions are identified in the regulations." *Id.* at 3,535. And it "significantly narrow[ed] the scope" of the listed-transaction category after considering stakeholder comments. *Id.* at 3,541.

Treasury acknowledged that "captive transactions can differ significantly from one transaction to the next" and that whether a particular transaction constitutes insurance for federal tax purposes is "a totality of the circumstances inquiry." 90 Fed. Reg. at 3,555. But it appropriately rejected the suggestion that it was "unreasonable to designate any category of transactions as transactions known to be abusive." *Id.* To the contrary, the listed-transaction designation in the final regulation was one that Treasury was "confident" captured "a fact pattern that consistently gives rise to tax avoidance." *Id.* at 3,555. At bottom, Treasury "acted within a zone of reasonableness," and the listed-transaction regulation should be upheld. *Prometheus Radio*, 592 U.S. at 423.

### B. If this Court were to conclude that the listed-transaction regulation is invalid, it should remand the case to the District Court to reconsider the appropriate remedy

This Court should uphold Treas. Reg. §§1.6011-10 for the reasons set forth above. However, if this Court were to conclude that the listed-transaction regulation is invalid, it should remand the matter to the District Court to reconsider the appropriate remedy for any defects therein.

**1. Introduction: vacatur under the APA**[8]

Vacatur is an equitable remedy. *See High Cty. Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1229 (10th Cir. 2020); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015); *State of Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 327-29 (D.C. Cir. 2006). Like other equitable remedies, then, vacatur is subject to ordinary equitable principles. Courts "possess broad discretion" to fashion appropriate remedies under the APA, just as they possess broad discretion to fashion appropriate equitable remedies generally. *Black Warrior*, 781 F.3d at 1290. In fashioning that relief, the court pays regard to equitable considerations that may make any particular relief

[8] The Government maintains that the APA does not authorize vacatur of agency rules, *see United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring), much less universal vacatur, *see Texas Med. Ass'n v. U.S. Dep't of Health and Human Servs.*, 188 F.4th 359, 371 (5th Cir. 2026) (Ho, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, J., concurring). The latter position is the subject of a pending petition for writ of *certiorari*. *U.S. Dep't of Health and Human Servs. v. Texas Med. Ass'n*, No. 26-491 (S. Ct.). We reserve the right to challenge the propriety of this Court's contrary caselaw in a petition for rehearing *en banc* or a petition for writ of *certiorari*. *See Cargill*, 57 F.4th at 472; *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F4th 846, 859 (5th Cir. 2022) (en banc) (plurality opinion).

inappropriate; as the Supreme Court has explained, "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case," enabling the "adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944). Significantly, these considerations include "the complete-relief principle," under which equitable relief can extend no further than providing "complete relief *to the plaintiffs before the court*." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025).

Courts thus may, in appropriate circumstances, remand a defective agency rule to the agency without vacating it. *Cent. & S.W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). And in determining whether vacatur is warranted, courts generally consider factors analogous to those that govern the award of other forms of equitable relief, such as preliminary injunctions. *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety and Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990). This is consistent with the principle that courts "do not lightly assume that Congress has intended

to depart from established principles" of equity. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *accord Hecht Co.*, 321 U.S. at 329. Indeed, Congress reinforced this principle in the APA, expressly providing that its authorization of judicial review does not affect "the power or duty of the court to … deny relief on any … equitable ground." 5 U.S.C. §702(1).

Against this backdrop, vacatur is sometimes described as "the default rule in this Circuit," but it is by no means the absolute rule. *Cargill*, 57 F.4th at 472. Depending on the circumstances, it may well be appropriate to award "a more limited remedy." *Id.* For example, "party-specific vacatur," rather than universal vacatur, "is definitely appropriate" in some situations. *Texas Med. Ass'n v. U.S. Dep't of Health and Human Servs.*, 120 F.4th 494, 510 (5th Cir. 2024), *reh'g en banc granted, panel op. vacated per curiam*, 138 F.4th 961 (5th Cir. 2025).

### 2. The District Court abused its discretion in vacating the listed-transaction regulation nationwide

After the District Court concluded that Treas. Reg. §1.6011-10 was invalid, it vacated the regulation nationwide. (ROA.24929-24931.) In doing so, the court failed to consider whether a more limited vacatur

would have been appropriate and, correspondingly, abused its discretion.

The District Court started off on the right foot by recognizing that it had discretion to tailor an appropriate remedy, insofar as it considered whether to remand the listed-transaction regulation to Treasury without vacating it. (ROA.24929-24930.) However, the court did not consider other ways in which it could have tailored its vacatur remedy, such as vacatur only as to plaintiffs, only within the district court's territorial jurisdiction, or only within the Fifth Circuit. By failing to consider such alternatives, the court abused its discretion. *See PHH Mortgage Corp. v. Old Republic Nat'l Title Ins. Co.*, 80 F.4th 555, 559 (5th Cir. 2023) ("a district court abuses its discretion when it does not consider a relevant factor that should have been given significant weight") (citation and internal quotations omitted).

Considering the possibility of more limited relief was especially important here because, as in *Cargill*, the regulation at issue was the subject of litigation in multiple forums. 57 F.4th at 457-58. Indeed, the District Court was aware that the U.S. District Court for the Eastern District of Tennessee had already upheld the listed-transaction

regulation and that the U.S. District Court for the Northern District of Texas was poised to rule on its validity. (ROA.24889.) Nonetheless, the District Court vacated the regulation nationwide, effectively claiming veto power over the *CIC Services* court's earlier ruling and whatever result the Sixth Circuit may ultimately reach in the appeal therefrom. And the District Court's nationwide vacatur order had the further effect of forestalling consideration by the *Ryan* court, which concluded that it could no longer grant any effective relief and "denie[d] as moot the parties' respective requests that the Court vacate or uphold § 1.6011-10." 2026 WL 1847197 at *5.

In short, this case presents a stark example of the problems engendered when a district court awards universal relief, including "strain[ing] our separation of powers" by "allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide," *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring); circumventing the procedural rules governing joinder and class actions, *CASA*, 606 U.S. at 849-50; encouraging forum shopping by empowering a single district judge to nullify the decision of another court upholding the challenged agency action, *Texas*, 599 U.S. at 703 (Gorsuch, J.,

concurring); and "short-circuit[ing] the decisionmaking benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top," *Arizona*, 40 F.4th at 396 (Sutton, J., concurring); *see Texas*, 599 U.S. at 694 (Gorsuch, J.). This Court should therefore remand for the District Court to reconsider its award of such relief.

## CONCLUSION

The judgment of the District Court should be affirmed in part and reversed in part, with the case remanded for further proceedings.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
JOSHUA WU
*Deputy Assistant Attorney General*

/s/ *Geoffrey J. Klimas*

FRANCESCA UGOLINI (202) 514-3361
ELLEN PAGE DELSOLE (202) 514-8128
GEOFFREY J. KLIMAS (202) 307-6346
*Attorneys, Tax Litigation Branch*
*Civil Division, U.S. Department of Justice*
*Post Office Box 502, Washington, D.C. 20044*

OCTOBER 23, 2026

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 15,288 words, **or**

[ ] this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ] this brief has been prepared in a monospaced typeface using _____________________ with _________________.

3. All required privacy redactions have been made in accordance with Local Rule 25.2.13. The document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses. The electronic and paper submissions are identical as required by Local Rule 25.2.1.

(s) /s/ *Geoffrey J. Klimas*

Attorney for Appellees/Cross-Appellants

Dated: October 23, 2026